# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

| I.(a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Dwight E. Dickerson, on behalf of himself and all others similarly situated | Intel Corporation |

| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____ (EXCEPT IN U.S. PLAINTIFF CASES)<br><br>Alameda | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ (IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.<br>Santa Clara |

| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br><br>Bruce Wecker, Hosie McArthur LLP<br>1 Market, #2200, San Francisco, CA 94105; 415.247.6000 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF

(For diversity cases only)

AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☑ Original Proceeding

☐ Removed from State Court

☐ Remanded from Appellate Court

☐ Reinstated or Reopened

☐ Transferred from Another district (specify)

☐ Multidistrict Litigation

☐ Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury Med Malpractice<br>☐ 365 Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br><br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY** | ☐ 400 State Reapportionment<br>☑ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Amer w/ disab - Empl<br>☐ 446 Amer w/ disab - Other<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV | ☐ 510 Motion to Vacate Sentence Habeas Corpus:<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt Relations<br>☐ 730 Labor/Mgmt Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (US Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |

## VI. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

15 U.S.C. § 2

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ CHECK YES only if demanded in complaint:

JURY DEMAND: ☑ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)

(PLACE AND "X" IN ONE BOX ONLY)

☑ SAN FRANCISCO/OAKLAND ☐ SAN JOSE

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 7/11/2005 | Bruce J. Wecker |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
                                    )
                                    )
DWIGHT E. DICKERSON                 )
           Plaintiff(s) E-Filing    )
                                    )        C 05-02818 JL
    -v-                             )
                                    )  ORDER SETTING INITIAL CASE MANAGEMENT
INTEL CORPORATION                   )  CONFERENCE
           Defendant(s)             )
                                    )
```

IT IS HEREBY ORDERED that this action is assigned to the
Honorable James Larson.  When serving the complaint or
notice of removal, the plaintiff or removing defendant must
serve on all other parties a copy of this order, the handbook
entitled "Dispute Resolution Procedures in the Northern District
of California," the Notice of Assignment to United States Magistrate
Judge for Trial, and all other documents specified in Civil Local Rule 4-2.
Counsel must comply with the case schedule listed below unless the
Court otherwise orders.

IT IS FURTHER ORDERED that this action is assigned to the
Alternative Dispute Resolution (ADR) Multi-Option Program governed
by ADR Local Rule 3.  Counsel and clients must familiarize themselves
with that rule and with the handbook entitled "Dispute Resolution
Procedures in the Northern District of California."

CASE SCHEDULE   [ADR MULTI-OPTION PROGRAM]

| Date | Event | Governing Rule |
|------|-------|----------------|
| 07/11/2005 | Complaint filed | |
| 10/19/2005 | Last day to meet and confer re initial disclosures, early settlement, ADR process selection, and discovery plan | FRCivP 26(f) & ADR LR 3-5 |
| 10/19/2005 | Last day to file Joint ADR Certification with Stipulation to ADR process or Notice of Need for ADR Phone Conference | Civil L.R. 16-8 |
| 11/02/2005 | Last day to complete initial disclosures or state objection in Rule 26(f) Report, file/serve Case Management Statement, and file/serve Rule 26(f) Report | FRCivP 26(a)(1) Civil L.R.16-9 |
| 11/09/2005 | Case Management Conference in Ctrm F,15th Floor,SF at 10:30 AM | Civil L.R. 16-10 |

SPENCER HOSIE (#101777)
BRUCE J. WECKER (#078530)
HOSIE McARTHUR LLP
One Market Street,
Spear Street Tower #2200
San Francisco, California 94105
Telephone: (415) 247-6000
Facsimile: (415) 247-6001

**E-Filing**

ORIGINAL
FILED

JUL 1 1 2005

RICHARD W. WIEKING
NORTHERN DISTRICT OF CALIFORNIA

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

DWIGHT E. DICKERSON, a resident of
Oakland, California, on behalf of himself
and all others similarly situated,

        Plaintiff,

vs.

INTEL CORPORATION, a Delaware
corporation,

        Defendant.

CIVIL ACTION NO.

**C 05 2818**

**JL**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

    1.    Plaintiff Dwight E. Dickerson, a resident of Oakland, California, by and through his undersigned attorneys, and for his class action complaint against Intel Corporation and its worldwide family of dominated subsidiaries, including Intel Kabushiki Kaisha (collectively "Intel"), aver on knowledge as to himself and his own acts and on information and belief as to all other matters, as follows.

## I.    NATURE OF THE ACTION

    2.    Intel holds a monopoly in a market critical to the nation's economy: microprocessors that run the Microsoft Windows and Linux families of operating systems (the "x86 Microprocessor Market"). While Advanced Micro Devices, Inc. and its subsidiary AMD International Sales & Service, Ltd. (collectively "AMD") compete with Intel in this global market, Intel possesses unmistakable and undeniable market power, its microprocessor revenues accounting for approximately 90% of the worldwide total (and 80% of the units).

3. For over a decade Intel has unlawfully maintained its monopoly by engaging in a relentless, worldwide campaign to coerce customers to refrain from dealing with AMD that has resulted in consumers paying higher prices for x86 microprocessors and left them with fewer buying choices for such microprocessors. Among other things:

- Intel has forced major direct customers into exclusive or near-exclusive deals;

- it has conditioned rebates, allowances and market development funding on direct customers' agreement to severely limit or forego entirely purchases from AMD;

- it has established a system of discriminatory, retroactive, first-dollar rebates triggered by purchases at such high levels as to have the practical and intended effect of denying customers the freedom to purchase any significant volume of processors from AMD;

- it has threatened retaliation against direct customers introducing AMD computer platforms, particularly in strategic market segments;

- it has established and enforced quotas among key retailers effectively requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers, thereby artificially limiting consumer choice;

- it has forced PC makers and technology partners to boycott AMD product launches and promotions;

- and it has abused its market power by forcing on the industry technical standards and products which have as their central purpose the handicapping of AMD in the marketplace.

4. Intel's economic coercion of customers extends to all levels—from large computer-makers like Hewlett-Packard and IBM to small system-builders to wholesale distributors to retailers such as Circuit City. All must either accept conditions that exclude AMD or suffer discriminatory pricing and competitively crippling treatment. In this way, Intel has avoided competition on the merits and deprived AMD of the opportunity to stake its prices and quality against Intel's for every potential microprocessor sale.

-2-

COMPLAINT

1         5.    Intel's conduct has become increasingly egregious over the past several
2 years as AMD has achieved technological leadership in critical aspects of microprocessor
3 architecture. In April of 2003, AMD introduced its Opteron microprocessor, the first
4 microprocessor to take x86 computing from 32 bits to 64 bits—an advance that allows
5 computer applications to address exponentially more memory, thereby increasing performance
6 and enabling features not possible with just 32 bits. Unlike Intel's 64-bit architecture of the
7 time (Itanium), the AMD Opteron—as well as its subsequently-introduced desktop cousin, the
8 AMD Athlon64—offers backward compatibility, allowing PC users to continue using 32-bit
9 software as, over time, they upgrade their hardware. Bested in a technology duel over which it
10 long claimed leadership, Intel increased exploitation of its market power to pressure customers
11 to refrain from migrating to AMD's superior, lower-cost microprocessors.

12         6.    Intel's conduct has caused computer manufacturers continue to buy most
13 of their requirements from Intel, continue to pay monopoly prices, continue to be exposed to
14 Intel's economic coercion, and continue to submit to artificial limits Intel places on their
15 purchases from AMD. With AMD's opportunity to compete thus constrained, the cycle
16 continues, and Intel's monopoly profits continue to flow.

17         7.    Consumers such as plaintiff ultimately foot this bill, in the form of
18 inflated PC prices and the loss of freedom to purchase computer products that best fit their
19 needs. Society is worse off for lack of innovation that only a truly competitive market can
20 drive. The Japanese Government recognized these competitive harms when on March 8, 2005,
21 its Fair Trade Commission (the "JFTC") recommended that Intel be sanctioned for its
22 exclusionary misconduct directed at AMD. Intel chose not to contest the charges. *See*
23 <http://www.jfte.go.jp/e-page/pressreleases/2005/march/050308intel.pdf>. The European
24 Commission has also recently stepped up its investigation of Intel's marketing practices. *See*
25 <http://news.com/EU+revisits+Intel+probe/2100-7341_3-5228652.html?tag=nl>.

26         8.    Recently, AMD has struck back by filing antitrust actions against Intel.
27 On June 27, 2005, it filed an antitrust action against Intel in the United States District Court for
28 the District of Delaware, revealing to the public for the first time many of Intel's unlawful

-3-

1 practices. Many of the allegations in this Complaint are based on those revelations. On June

2 30, 2005, AMD also filed two antitrust suits in Japan against Intel Kabushiki Kaisha.

## II. JURISDICTION AND VENUE

4       9.    The Court has subject matter jurisdiction under 28 U.S.C. §1337

5 (commerce and antitrust regulation) and 28 U.S.C. §1331 (federal question), as this action

6 arises under Section 2 of the Sherman Act (15 U.S.C. §2) and Sections 4 and 16 of the Clayton

7 Act (15 U.S.C. §§15(a) and 26). The Court has supplemental subject matter jurisdiction of the

8 pendent state law claims under 28 U.S.C. §1367.

9       10.    Venue is proper because Intel resides and is found in this district within

10 the contemplation of 28 U.S.C. §1391(b) and (c) and as provided in Sections 4 and 12 of the

11 Clayton Act (15 U.S.C. §§15 and 22).

## III. INTRADISTRICT ASSIGNMENT

13       11.    Pursuant to Northern District Local Rule No. 3-5(b), plaintiff requests

14 assignment to the San Francisco Division. The plaintiff resides within the Alameda County,

15 plaintiff's counsel is located in San Francisco and several lawsuits alleging similar claims are

16 already on file there.

## IV. THE PARTIES

18       12.    Dwight E. Dickerson is a resident of Oakland. Plaintiff purchased a

19 personal computer from Dell Computer with a x86 microprocessor (Pentium 4) supplied by

20 Intel within the last four years.

21       13.    Defendant Intel Corporation is a Delaware corporation with its principal

22 executive offices at Santa Clara, California, and it conducts business both directly and through

23 wholly-owned and dominated subsidiaries worldwide. Intel and its subsidiaries design,

24 produce, and sell a wide variety of microprocessors, flash memory devices, and silicon-based

25 products for use in the computer and communications industries worldwide.

26

27

28

-4-

COMPLAINT

1
## V.     CLASS ACTION ALLEGATIONS

2            14.     Plaintiff brings this suit as a class action pursuant to Rules 23(b)(2) and

3 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and a Plaintiff Class (the

4 "Class") composed of and defined as follows:

5          All persons and entities residing in the United States who, during
         the last four years, purchased an x86 microprocessor in the
6          United States indirectly from the Intel. Specifically excluded
         from this Class are Intel; the officers, directors or employees of
7          Intel; any entity in which Intel has a controlling interest; and any
         affiliate, legal representative, heir or assign of Intel. Also
8          excluded are any federal, state or local governmental entities, any
         judicial officer presiding over this action and the members of
9          his/her immediate family and judicial staff, and any juror assigned
         to this action
10

11            15.     This action has been brought and may be properly maintained as a class

12 action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

13          a.     The Class is ascertainable and there is a well-defined community of

14              interest among the members of the Class;

15          b.     Based upon the nature of the trade and commerce involved and the

16              number of indirect purchasers of x86 microprocessors, plaintiff believes

17              that the members of the Class number in the thousands, and therefore is

18              sufficiently numerous that joinder of all Class members is not

19              practicable;

20          c.     Plaintiff's claims are typical of the claims of the members of the Class

21              because plaintiff indirectly purchased a x86 microprocessor from Intel or

22              its co-conspirators, and therefore plaintiff's claims arise from the same

23              common course of conduct giving rise to the claims of the members of

24              the Class and the relief sought is common to the Class;

25          d.     The following common questions of law or fact, among others, exist as

26              to the members of the Class:

27              i.     whether Intel unlawfully monopolized and conspired to

28                  monopolize the x86 Microprocessor Market;

-5-

COMPLAINT

| | | | |
|---|---|---|---|
| 1 | | ii. | whether Intel's conduct caused x86 microprocessor prices to be |
| 2 | | | higher than they would have been in the absence of such conduct; |
| 3 | | iii. | the operative time period of Intel's unlawful conduct; |
| 4 | | iv. | whether Intel's conduct caused injury to the business or property |
| 5 | | | of Plaintiff and the members of the Class; |
| 6 | | v. | the appropriate measure of the amount of damages suffered by the |
| 7 | | | Class; |
| 8 | | vi. | whether Intel's conduct violates Section 2 of the Sherman Act; |
| 9 | | vii. | whether Intel's conduct violates Sections 16720 and 17200 of the |
| 10 | | | California Business and Professions Code and the California |
| 11 | | | common law dealing with the tort of monopolization; |
| 12 | | viii. | whether Intel's conduct violates the antitrust, unfair competition |
| 13 | | | and consumer protection laws of the other states as alleged below; |
| 14 | | ix. | the appropriate nature of class-wide equitable relief. |
| 15 | e. | | These and other questions of law or fact which are common to the |
| 16 | | | members of the Class predominate over any questions affecting only |
| 17 | | | individual members of the Class; |
| 18 | f. | | After determination of the predominate common issues identified above, |
| 19 | | | if necessary or appropriate, the Class can be divided into logical and |
| 20 | | | manageable subclasses; |
| 21 | g. | | Plaintiff will fairly and adequately protect the interests of the Class in |
| 22 | | | that Plaintiff has no interests that are antagonistic to other members of the |
| 23 | | | Class and has retained counsel competent and experienced in the |
| 24 | | | prosecution of class actions and antitrust litigation to represent himself |
| 25 | | | and the Class; |
| 26 | h. | | A class action is superior to other available methods for the fair and |
| 27 | | | efficient adjudication of this litigation since individual joinder of all |
| 28 | | | damaged Class members is impractical. The damages suffered by |

-6-

COMPLAINT

1     individual Class members are relatively small, given the expense and

2     burden of individual prosecution of the claims asserted in this litigation.

3     Thus, absent the availability of class action procedures, it would not be

4     feasible for Class members to redress the wrongs done to them. Even if

5     the Class members could afford individual litigation, the court system

6     could not. Further, individual litigation presents the potential for

7     inconsistent or contradictory judgments and would greatly magnify the

8     delay and expense to all parties and to the court system. Therefore, the

9     class action device presents far fewer case management difficulties and

10    will provide the benefits of unitary adjudication, economy of scale and

11    comprehensive supervision by a single court;

12    i.     Intel has acted, and refused to act, on grounds generally applicable to the

13           Class, thereby making appropriate final injunctive relief with respect to

14           the Class as a whole; and

15    j.     In the absence of a class action, Intel would be unjustly enriched because

16           they would be able to retain the benefits and fruits of their wrongful

17           conduct.

18    16.    The Claims in this case are also properly certifiable under the laws of the

19    State of California, and of the other individual states identified below in the Fifth and Sixth

20    Claims for Relief.

21                              **VI.     INITIAL FACTUAL BACKGROUND**

22    **A.     Early History**

23    17.    The brain of every computer is a general-purpose microprocessor, an

24    integrated circuit capable of executing a menu of instructions and performing requested

25    mathematical computations at very high speed. Microprocessors are defined by the ir

26    instruction set—the repertoire of machine language instructions that a computer can follow.

27    So, too, are computer operating systems—software programs that perform the instructions in

28    the set allowing the computer to perform meaningful tasks. The first generation of

-7-

1  microprocessors, which were capable of handling 4 and then later 8 bits of data simultaneously,

2  evolved to provide 16-bit capability (the original DOS processors), then sometime later a 32-bit

3  capability (allowing the use of advanced graphical interfaces such as later versions of

4  Windows), and now 64-bit capability.

5  18.  When IBM defined the original PC standards in the early 1980s, it had

6  available to it a variety of microprocessors, each with its own instruction set—among these

7  were microprocessors developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel

8  and AMD.  IBM opted for the Intel architecture, which utilized what became known as the x86

9  instruction set (after Intel's naming convention for its processors, *i.e.*, 8086, 80186, 80286,

10  80386), and a compatible operating system offered by Microsoft, known as DOS.  Unwilling to

11  be consigned to a single source of supply, however, IBM demanded that Intel contract with

12  another integrated circuit company and license it to manufacture x86 chips as a second source.

13  AMD, which had worked with Intel before in supplying microprocessors, agreed to abandon its

14  own, competing architecture, and it undertook to manufacture x86 chips as a second source of

15  supply.  Assured that it would not be dependent upon a monopoly supplier of x86 chips, IBM

16  introduced the PC in August 1981—and its sales exploded.

17  19.  Although, as discussed below, an arbitrator later found that "AMD's

18  sponsorship helped propel Intel from the chorus line of semiconductor companies into instant

19  stardom," Intel soon set out to torpedo the 1982 AMD-Intel Technology Exchange Agreement

20  (the "Agreement") by which each would serve as a second source for products developed by

21  the other.  For example, Intel was required by the Agreement to send AMD timely updates of

22  its second generation 80286 chip.  Instead, in a "deliberate[]" effort "to shackle AMD

23  progress," Intel sent AMD information "deliberately incomplete, deliberately indecipherable

24  and deliberately unusable by AMD engineers."  The conduct was, in the arbitrator's words,

25  "inexcusable and unworthy."  And it was not isolated.  Intel elsewhere tried to "sabotage"

26  AMD products, engaged in "corporate extortion" and demonstrated a near-malevolent

27  determination "to use all of its economic force and power on a smaller competitor to have its

28  way."

-8-

1           20.    In another underhanded effort to stifle AMD's business, Intel decided in

2 1984 that, the agreement between the parties notwithstanding, Intel would become the sole-

3 source for the promising 80386 chip. To fully realize its objective, Intel engaged in an

4 elaborate and insidious scheme to mislead AMD (and the public) into erroneously believing that

5 AMD would be a second source, thereby keeping AMD in the Intel "competitive camp" for

6 years. This duplicitous strategy served a broader purpose than simply preventing AMD from

7 competing with Intel. Customers' perception that AMD would continue to serve as Intel's

8 authorized second source was essential to Intel's aim of entrenching the x86 family of

9 microprocessors as the industry standard (as it had been essential to IBM's original introduction

10 of the PC). Intel was well aware that if computer manufacturers knew Intel intended to sole

11 source its 32-bit product, they would be motivated to select alternative products produced by

12 companies offering second sources. Intel could not preserve the appearance that AMD would

13 second source the 386 if it terminated the contract or otherwise disclosed its actual intent.

14 Thus, Intel stalled negotiations over product exchanges, while at the same time allowing AMD

15 to believe that it could ultimately obtain the 386. This injured competition by deterring and

16 impeding serious competitive challenges to Intel and directly injured AMD by depriving it of

17 the revenues and profits it would have earned from such a challenge.

18           21.    Intel implemented this secret plan for the purpose of acquiring and

19 maintaining an illegal monopoly in the x86 line of microprocessors, which it did by at least

20 1987. As was its plan, Intel's conduct drained AMD's resources, delayed AMD's ability to

21 reverse-engineer or otherwise develop and manufacture competitive products, and deterred

22 AMD from pursuing relationships with other firms. In so doing, Intel wrongfully secured the

23 benefit of AMD's marketing skills and talent in support of the x86 line of microprocessors and

24 related peripherals and secured the benefit of substantial competitively sensitive AMD

25 information regarding its product development plans. When AMD petitioned to compel

26 arbitration in 1987 for Intel's breach and bad faith, the arbitrator took notice of Intel's

27 anticompetitive design: "In fact, it is no fantasy that Intel wanted to blunt AMD's effectiveness

28 in the microprocessor marketplace, to effectively remove AMD as a competitor."

-9-

1          22.    In 1992, after five years of litigation, the arbitrator awarded AMD more

2   than $10 million plus prejudgment interest and a permanent, nonexclusive and royalty-free

3   license to any Intel intellectual property embodied in AMD's own 386 microprocessor,

4   including the x86 instruction set. Confirmation of the award was upheld by the California

5   Supreme Court two years later. *Advanced Micro Devices, Inc. v. Intel Corp.*, 9 Cal. 4th 462,

6   885 P.2d 994, 36 Cal. Rptr. 2d 581 (1994).

7   **B.    AMD Moves from Second Source to Innovator**

8          23.    Shortly after confirmation of the award, AMD settled its outstanding

9   disputes with Intel in a 1995 agreement which gave AMD a shared interest in the x86

10  instruction set but required it to develop its own architecture to implement those instructions.

11  The settlement had the unintended benefit of forcing AMD to reinvent itself. Beginning in the

12  late 1990s, AMD committed its resources to innovating not just to be different, but to deliver

13  solutions of greatest benefit to its customers. AMD's first x86 chip without Intel pin-

14  compatibility, the Athlon microprocessor delivered in 1999, marked the first (but not last) time

15  AMD was to leapfrog Intel technologically and beat it to market with a new generation

16  Windows microprocessor (and break the 1GHz speed barrier to boot).

17         24.    AMD's biggest breakthrough came four years later when it introduced an

18  extension of x86 architecture that took Windows processors into the realm of 64-bit computing.

19  Unlike Intel, which invested billions in its Itanium microprocessor and a new, uniquely 64-bit

20  proprietary instruction set (which, because it was proprietary, would have been a game-ending

21  development for AMD had it become the industry standard), AMD undertook to supplement

22  the x86 instructions to accommodate 64-bit processing while allowing 32-bit software to be run

23  as well. AMD's efforts culminated when, in April of 2003, it brought to market its Opteron

24  microprocessor for servers (the workhorse computers used by businesses to run corporate

25  networks, e-commerce websites and other high-end, computationally-intense applications).

26  Opteron was the industry's first x86 backward compatible 64-bit chip. Six months later, AMD

27  launched the Athlon64, a backward compatible 64-bit microprocessor for desktops and mobile

28  computers.

-10-

1         25.     The computing industry hailed AMD's introduction of 64-bit computing

2 as an engineering triumph. *InfoWorld* in its August 27, 2004 issue stated:

3         You just gotta love a Cinderella story. ... AMD's rapid rise from startup to $5 billion semiconductor powerhouse is, as Humphrey

4         Bogart's English teacher once said, the stuff of which dreams are made. ... In the process, AMD has become known as the

5         company that kept Intel honest, the Linux of the semiconductor world. ... After decades of aping Intel architectures, the AMD64

6         architecture, rooted in Opteron and Athlon 64 processors, has actually been imitated by Intel in the form of Nocona, Intel's 64-

7         bit version of Xeon. In a stunning reversal of fortune, Intel was forced to build that chip because Opteron was invading a server

8         market that the Intel Itanium was supposed to dominate. (<http://www.infoworld.com/article/04/08/27/35FEamd_1.html?

9         s=feature>.)

10 Microsoft endorsed AMD's 64-bit instruction set and announced that Windows would support

11 it. As noted by *Infoworld*, Intel then copied AMD's technology for its own 64-bit offerings—

12 an event that poignantly marked AMD's technological emergence.

13         26.     AMD has since extended its AMD64 technology to the balance of

14 AMD's microprocessor line-up (which now includes AMD Athlon 64, AMD Athlon 64 FX,

15 Mobile AMD Athlon 64, AMD Sempron, and AMD Turion64 products). Owing also to

16 AMD's pioneering developments in dual-core processors and its introduction of an improved

17 architecture that speeds up microprocessor communications with memory and input/output

18 devices, AMD has seized technological leadership in the microprocessor industry. Its

19 innovation has won for it over 70 technology leadership and industry awards and, in April

20 2005, the achievement of being named "Processor Company of 2005" at, to Intel's

21 embarrassment, an Intel-sponsored industry awards show.

22         27.     AMD's market share has not kept pace with its technical leadership.

23 Intel's misconduct is the reason. Intel has unlawfully maintained the monopoly IBM bestowed

24 on it and systematically excluded AMD from any meaningful opportunity to compete for

25 market share by preventing the companies that buy chips and build computers from freely

26 deploying AMD processors; by relegating AMD to the low-end of the market; by preventing

27 AMD from achieving the minimum scale necessary to become a full-fledged, competitive

28

-11-

1 | alternative to Intel; and by erecting impediments to AMD's ability to increase its productive

2 | capacity for the next generation of AMD's state of the art microprocessors.

3 | ### VII. THE x86 PROCESSOR INDUSTRY

4 | **A. Competitive Landscape**

5 |     28. The x86 versions of Windows and Linux, the two operating systems that

6 | dominate the business and consumer computer worlds, have spawned a huge installed base of

7 | Windows- and Linux-compatible application programs that can only run the x86 instruction set.

8 | This has given Intel effective ownership of personal computing. Although other

9 | microprocessors are offered for sale, the non-x86 microprocessors are not reasonably

10 | interchangeable with x86 microprocessors because none can run the x86 Windows or Linux

11 | operating systems or the application software written for them.

12 |     29. The relevant product market is x86 microprocessors because a putative

13 | monopolist in this market would be able to raise the prices of x86 microprocessors above a

14 | competitive level without losing so many customers to other microprocessors as to make this

15 | increase unprofitable. While existing end-users can theoretically shift to other operating system

16 | platforms, high switching costs associated with replacing existing hardware and software make

17 | this impractical. Further, the number of new, first-time users who could choose a different

18 | operating-system platform is too small to prevent an x86 microprocessor monopolist from

19 | imposing a meaningful price increase for a non-transitory period of time. Computer

20 | manufacturers would also encounter high switching costs in moving from x86 processors to

21 | other architectures, and no major computer maker has ever done it. In short, demand is not

22 | cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

23 |     30. The relevant geographic market for x86 microprocessors is worldwide.

24 | A relevant geographic submarket is the United States. A worldwide geographic market is

25 | appropriate because Intel and AMD compete globally; PC platform architecture is the same

26 | from country to country; microprocessors can be easily and inexpensively shipped around the

27 | world, and frequently are; and the potential for arbitrage prevents chipmakers from pricing

28 |

-12-

1 processors differently in one country than another. A geographic submarket consisting of the
2 United States is appropriate, as well.

3        31.     Intel dominates the worldwide x86 Microprocessor Market. According
4 to published reports, over the past several years it has consistently achieved more than a 90%
5 market share as measured by revenue, while AMD's revenue share has remained at
6 approximately 9%, with all other microprocessor manufacturers relegated to less than 1%.
7 Intel has captured at least 80% of x86 microprocessor unit sales in seven of the last eight years.
8 Since 1999, AMD's worldwide volume share has hovered at 15%, only once penetrating barely
9 the 20% level. The following chart is illustrative:

10 

**x86 Worldwide CPU Unit Market Share**

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|
| Intel | 85.0% | 80.3% | 82.2% | 82.2% | 78.7% | 83.6% | 82.8% | 82.5% |
| AMD | 7.3% | 11.9% | 13.6% | 16.7% | 20.2% | 14.9% | 15.5% | 15.8% |
| Others | 7.5% | 7.9% | 4.2% | 1.1% | 1.1% | 1.4% | 1.7% | 1.7% |

16        32.     Intel's x86 family of microprocessors no longer faces any meaningful
17 competition other than from AMD. National Semiconductor acquired Cyrix in 1997 but
18 shuttered it less than two years later. At the beginning of this year only two other x86 chip
19 makers remained, Via Technologies, Inc. and Transmeta Corporation—which together account
20 for less than 2% of the market. Transmeta has since announced its intention to cease selling
21 x86 microprocessors, and Via faces dim prospects of growing its market share to a sustaining
22 level.

23        33.     Intel is shielded from new competition by huge barriers to entry. A chip
24 fabrication plant ("fab") capable of efficiently mass-producing x86 microprocessors carries a
25 price tag of at least $2.5 to $3.0 billion. In addition, any new entrant would need the financial
26 wherewithal to underwrite the billions more in research and development costs to design a
27 competing x86 microprocessor and to overcome almost insurmountable IP and knowledge
28 barriers.

-13-

**B.** **Customers for x86 microprocessors**

34. Annual worldwide consumption of x86 microprocessors currently stands at just over 200 million units per year and is expected to grow by 50% over the remainder of the decade. Relatively few microprocessors are sold for server and workstation applications (8.75 million in 2004), but these command the highest prices. Most x86 microprocessors are used in desktop PCs and mobile PCs, with desktops currently outnumbering mobile by a margin of three to one. Of the total worldwide production of computers powered by x86 microprocessors, 32% are sold to U.S. consumers; U.S. sales of AMD-powered computers account for 29% of AMD's production.

35. The majority of x86 microprocessors are sold to a handful of large OEMs (original equipment manufacturers), highly visible companies recognized throughout the world as the leading computer makers. Regarded by the industry as "Tier One" OEMs over most product categories are: Hewlett-Packard ("HP"), which now also owns Compaq Computer ("Compaq"); Dell, Inc. ("Dell"); IBM, which as of May 1, 2005, sold its PC (but not server) business to Lenovo; Gateway/eMachines; and Fujitsu/Fujitsu Siemens ("Fujitsu"), the latter a Europe-based joint venture. Toshiba, Acer, NEC and Sony are also commonly viewed as Tier One OEMs in the notebook segment of the PC market. HP and Dell are the dominant players, collectively accounting for over 30% of worldwide desktop and mobile sales, and almost 60% of worldwide server sales. Both are U.S.-based companies, as are IBM and Gateway/eMachines; and all but Gateway have U.S. manufacturing operations (as does Sony, which operates a North American production facility in San Diego).

36. Worldwide, the Tier One OEMs collectively account for almost 80% of servers and workstations (specialty high-powered desktops), more than 40% of worldwide desktop PCs, and over 80% of worldwide mobile PCs. According to industry publications, unit market share in 2004 among the Tier One OEMs were as follows:

-14-

COMPLAINT

**OEM Market Shares—2004**

| Company | Server/WS | Desktop | Mobile |
|---|---|---|---|
| Hewlett-Packard | 29.86% | 13.69% | 16.23% |
| Dell | 28.34% | 16.18% | 17.27% |
| IBM/Lenovo | 14.46% | 3.69% | 9.20% |
| Fujitsu/Siemens | 3.70% | 2.83% | 6.88% |
| Acer | 0.81% | 1.85% | 8.53% |
| Toshiba | 0.31% | 0.05% | 12.73% |
| NEC | 2.06 | 2.02% | 4.50% |
| Sony | -- | 0.76% | 4.23% |
| Gateway/eMachines | 0.16% | 2.48% | 1.45% |
| Total | 79.70% | 43.55% | 81.02% |

37.    The balance of x86 production is sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers and other, smaller distributors. Currently, distributors account for over half of AMD's sales.

38.    OEMs have adopted a variety of business models, including sales directly to customers through web-based e-commerce, sales through company-employed sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent distributors (who focus on smaller business customers). With the exception of Dell, which markets to consumers only directly (mostly over the internet), most OEMs also sell through retail chains. Intel and AMD compete not only to have OEMs incorporate their microprocessors into their retail platforms but also to convince retailers to allocate shelf-space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

39.    Through its economic muscle and relentless marketing—principally its "*Intel Inside*" and "*Centrino*" programs which financially reward OEMs for branding their PCs as Intel machines—Intel has transformed the OEM world. While once innovative companies themselves, the OEMs have largely become undifferentiated distributors of the Intel platform, offering "*Intel Inside*" and "*Centrino*" computers largely indistinguishable from those of their

-15-

1   rivals. As their products have become commoditized, the Tier One OEMs operate on small or

2   negative margins, and, as shown in the following chart, the overwhelming portion of PC profit

3   flows to Intel.

**Operating Margins 2001-04—Intel vs. OEMs**



40.     This profit drain has left OEMs and others in the distribution chain in a

quarter-to-quarter struggle to eke out even a modest return on their assets, thereby making

them continually susceptible to Intel's economic coercion, which is described next.

## VIII.   INTEL'S UNLAWFUL PRACTICES

41.     Intel has maintained its x86 microprocessor monopoly by deploying a

host of financial and other exclusionary business strategies that in effect limit its customers'

ability and/or incentive to deal with AMD. Although differing from customer to customer and

segment to segment, the Intel arsenal includes direct payments in return for exclusivity and

near-exclusivity; discriminatory rebates, discounts and subsidies conditioned on customer

"loyalty" that have the practical and intended effect of creating exclusive or near-exclusive

dealing arrangements; threats of economic retaliation against those who give, or even

contemplate giving, too much of their business to AMD, or who refuse to limit their AMD

business to Intel-approved models, brands, lines and/or sectors, or who cooperate too closely

with AMD's promotion of its competitive processors; and misuse of industry standards-setting

processes so as to disadvantage AMD products in the marketplace. As a result of these

-16-

1 | practices, consumers pay inflated prices for x86 microprocessors and equipment containing
2 | them, and have fewer competitor choices for such microprocessors.

3 |     42.    Intel's misconduct is global. It has targeted both U.S. and offshore
4 | customers at all levels to prevent AMD from building market share anywhere, with the goal of
5 | keeping AMD small and keeping Intel's customers dependent on Intel for very substantial
6 | amounts of product. In this way, OEMs remain vulnerable to continual threats of Intel
7 | retaliation, AMD remains capacity-constrained, the OEMs remain Intel-dependent, and Intel
8 | thereby perpetuates its economic hold over them, allowing it to continue to demand that
9 | customers curtail their dealings with AMD. And the cycle repeats itself: by unlawfully
10 | exploiting its existing market share, Intel is impeding competitive growth of AMD, thereby
11 | laying foundation for the next round of foreclosing actions with the effect that AMD's ability to
12 | benefit from its current technological advances is curtailed to the harm of potential customers
13 | and consumers.

14 |     43.    The following is not intended as an exhaustive catalog of Intel's
15 | misconduct, or a complete list of its unlawful acts, but only as examples of the types of
16 | improper exclusionary practices that Intel has employed.

17 | **A.    Practices Directed At OEMs.**

18 |     **1.    Exclusive and Near-Exclusive Deals.**

19 |     44.    **Dell.** In its history, Dell has not purchased a single AMD x86
20 | microprocessor despite acknowledging Intel shortcomings and customer clamor for AMD
21 | solutions, principally in the server sector. As Dell's President and CEO, Kevin Rollins, said
22 | publicly last February:

23 | > Whenever one of our partners slips on either the economics or
24 | > technology, that causes us great concern. ... For a while, Intel
   | > admittedly slipped technologically and AMD had made a step
   | > forward. We were seeing that in customer response and requests.
25 | > (<http://www.findarticles.com/p/articles/mi_zdext/is_200502/
   | > ai_n102988977>.)
26 |

27 |     45.    Nonetheless, Dell has been and remains Intel-exclusive. According to
28 | industry reports, Intel has bought Dell's exclusivity with outright payments and favorable
   | discriminatory pricing and service. In discussions about buying from AMD, Dell executives

-17-

COMPLAINT

1  have frankly conceded that they must financially account for Intel retribution in negotiating
2  pricing from AMD.

3      46.    **Sony**. With the introduction of its Athlon microprocessor in 1999, AMD
4  began to make notable inroads into Intel's sales to major Japanese OEMs, which export PCs
5  internationally including into the U.S. By the end of 2002, AMD had achieved an overall
6  Japanese unit market share of approximately 22%. To reverse the erosion of its business, in
7  2003 Intel paid Sony multimillion dollar sums, disguised as discounts and promotional support,
8  in exchange for absolute microprocessor exclusivity. Sony abruptly cancelled an AMD Mobile
9  Athlon notebook model. Soon thereafter, it cancelled plans to release AMD Athlon desktop
10 and notebook computers. As a result, AMD's share of Sony's business dropped from 23% in
11 2002 to 8% in 2003, and then to 0%, where it remains today. In proceedings brought by the
12 JFTC, Intel has accepted the JFTC charges of misconduct with respect to Sony.

13     47.    **Toshiba**. Like Sony, Toshiba was once a significant AMD customer,
14 but also like Sony, Toshiba received a very substantial payment from Intel in 2001 not to use
15 AMD processors. Toshiba thereupon dropped AMD. Its executives agreed that Intel's
16 financial inducements amounted to "cocaine," but said they were hooked because reengaging
17 with AMD would jeopardize Intel market development funds estimated to be worth $25-30
18 million per quarter. Toshiba made clear to AMD that the tens of millions of dollars of
19 additional marketing support was provided on the explicit condition that Toshiba could not use
20 AMD microprocessors. In proceedings brought by the JFTC, Intel has accepted the JFTC
21 charges of misconduct with respect to Toshiba.

22     48.    **NEC**. AMD also enjoyed early success with NEC, capturing nearly
23 40% of its microprocessor purchases for notebooks and desktops in the first quarter of 2002.
24 In May 2002, Intel agreed to pay NEC more than 300 million yen per quarter in exchange for
25 caps on NEC's purchases from AMD. The caps assured Intel at least 90% of NEC's business
26 in Japan, and they established an overall worldwide quota on NEC's AMD dealings. The
27 impact was immediate. While AMD had maintained an 84% share of NEC's Japanese
28 consumer desktop business in the third quarter of 2002, after the payments, AMD's share

COMPLAINT

1  quickly plummeted to virtually zero in the first quarter of 2003. NEC has made clear to AMD
2  that its Japanese share must stay in the single digits pursuant to NEC's agreement with Intel.
3  Worldwide, AMD's share dipped from nearly 40% to around 15%, where it stands today. In
4  proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with
5  respect to NEC.

6        49.    **Fujitsu**. In the summer of 2002, Fujitsu informed AMD that Intel had
7  pressured Fujitsu to remove Fujitsu's AMD-powered desktop models from Fujitsu's website.
8  Fujitsu complied by making any potential AMD-buyer click past Intel products to get to the
9  AMD offerings. Then, in early 2003, Intel moved to lock up an even greater share of Fujitsu's
10 business. Intel offered an undisclosed package of financial incentives in return for Fujitsu's
11 agreement to restrict it s dealings with AMD. Fujitsu's catalog currently limits AMD to a
12 single notebook product. In proceedings brought by the JFTC, Intel has accepted the JFTC
13 charges of misconduct with respect to Fujitsu.

14       50.    **Hitachi**. According to the JFTC, Intel has also purchased an exclusive-
15 dealing arrangement with Hitachi, which had been a substantial AMD customer. The
16 agreement caused AMD's Hitachi business to fall precipitously. For example, during the first
17 part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter. But
18 by the middle of the year, AMD sold no microprocessors to Hitachi at all. In proceedings
19 brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to
20 Hitachi.

21       51.    **Gateway/eMachines**. From 2001 to 2004, Gateway was exclusively
22 Intel. In 2001, former Gateway CEO Ted Waitt explained to an AMD executive that Intel
23 offered him large sums not to deal with AMD, which he could not refuse: "I have to find a
24 way back to profitability. If by dropping you, I become profitable, that is what I will do."
25 Shortly thereafter, Gateway stopped purchasing from AMD and issued a press release
26 announcing its Intel exclusivity. The announcement came within weeks of similar public
27 announcements of Intel exclusivity by both IBM and Micron.

28

COMPLAINT

52. **Supermicro.** Intel's exclusive dealing also extends to small, specialty OEMs of which Supermicro is a good example. Supermicro, the preeminent system assembler for servers and other high-end computers, historically has followed the Dell strategy of never buying from AMD. This arrangement foreclosed AMD from a large part of the approximately one fifth of the server sector not controlled by the Tier One OEMs. Following two years of negotiation, Supermicro finally agreed last year to begin developing an Opteron-powered server; however, it so feared Intel retaliation that it secretly moved the AMD development to quarters behind Supermicro's main manufacturing facility. Further, it forbade AMD from publicizing the product or beginning any marketing prior to its actual release. When, in April 2005, Supermicro finally broke away from years of Intel exclusivity, it restricted distribution of its newly-released Opteron-powered product to only sixty of its customers and promoted them with a glossy, upscale brochure devoid of its name and labeled "secret and confidential.".

**2. Product-Line, Channel or Geographic Restrictions.**

53. Intel has also bought more limited exclusivity from OEMs in order to exclude AMD from the most profitable lines or from channels of distribution best tailored to take advantage of AMD's price/performance advantage over Intel. In exchange for discriminatory discounts, subsidies or payments, for example, Intel has largely foreclosed AMD from the lucrative commercial desktop sector. Intel has focused on the major OEMs because, when IT executives from Fortune 1000 companies purchase desktop computers, they look for a strong brand on the box—Dell, IBM or HP. Knowing this, Intel has relentlessly fought to block the introduction of an AMD-powered commercial desktop by the major OEMs who have not ceded total exclusivity to Intel. What follows, again, are only representative examples of Intel misconduct.

54. **HP.** In 2002, when AMD set out to earn a place in HP's commercial desktop product roadmap, HP demanded a $25 million quarterly fund to compensate it for Intel's expected retaliation. Eager to break into the commercial market, and to earn a place in HP's successful "Evo" product line, AMD agreed instead to provide HP with the first million microprocessors for free in an effort to overcome Intel's financial hold over HP. On the eve of

-20-

1   the launch, HP disclosed its plan to Intel, which told HP it considered AMD's entry into HP's

2   commercial line a "Richter 10" event. It immediately pressured HP into (1) withdrawing the

3   AMD offering from its premier "Evo" brand and (2) withholding the AMD-powered computer

4   from HP's network of independent value-added resellers, the HP's principal point of access to

5   small business users for whom the computer was designed in the first place. Intel went so far

6   as to pressure HP's senior management to consider firing the HP executive who spearheaded

7   the AMD commercial desktop proposal. As a result of Intel's coercion, the HP-AMD desktop

8   offering was dead on arrival. HP ended up taking only 160,000 of the million microprocessors

9   AMD offered for free. As of today, HP's AMD-equipped commercial desktops remain

10   channel-restricted, and AMD's share of this business remains insignificant.

11          55.     Intel also purchased HP's exclusivity for its most popular notebook line.

12   HP captured 15% of the U.S. retail market last Christmas with an Intel-powered 14.1" display

13   notebook (the "DV 1000") with a popular power saving feature called Quick Play. When

14   AMD sought to convince HP to carry a similar AMD-powered notebook, HP declined. It

15   explained that Intel had paid between $3 and $4 million to lock up this product line for at least

16   one year.

17          56.     **Gateway**. After Gateway's 2004 merger with eMachines, AMD

18   attempted to revive the relationship it had enjoyed with Gateway until 2001, but experienced

19   extremely limited success. While Gateway built one AMD-powered desktop model at the

20   request of Circuit City, AMD remains locked out entirely of Gateway's direct internet sales, its

21   commercial offerings and its server line. According to Gateway executives, their Company has

22   paid a high price for even its limited AMD dealings. They claim that Intel has beaten them

23   into "guacamole" in retaliation.

24          57.     **IBM**. AMD and IBM began negotiations in August 2000 over a

25   proposed commercial PC business partnership. After seven months and with a deal nearing

26   completion, Intel approached IBM with an incentive-based program under which Intel would

27   become IBM's "preferred supplier" for processors in commercial products. "Preferred" meant

28   exclusive. IBM accepted Intel's proposal and terminated discussions with AMD. In return for

-21-

1    that exclusivity, according to IBM executive Ed Thum, Intel paid IBM "millions of dollars in

2    market development funds."

3              58.    Intel also acted to thwart AMD efforts to partner with IBM on servers.

4    Although IBM joined AMD as a launch partner when it introduced its Opteron 64-bit server

5    chip in April 2003—signaling to the industry and IT professionals its confidence in the

6    product—Intel soon dissuaded IBM from aggressively marketing Opteron servers. After

7    investing heavily in its design, IBM consigned its one Opteron computer model to a single

8    target market segment (High Performance and Technical Computing). This was done,

9    according to an industry report (confirmed by an IBM executive), because Intel paid IBM to

10   shelve any further Opteron development. IBM also took Intel money in 2004 to scrap plans for

11   a multiple-microprocessor Opteron server it had already designed and previewed with

12   customers.

13             59.    Intel has also purchased IBM exclusivity in its "ThinkCentre" line of

14   commercial desktops. When AMD pressed IBM to add an Athlon 64 model to its

15   "ThinkCentre" roadmap, IBM executives explained that the move would cost them important

16   Intel subsidies, and they declined.

17             60.    **Fujitsu.** In 2002, Fujitsu and AMD formed an alliance to develop a low-

18   power commercial notebook (FMV Lifebook MG Series) scheduled to go to market in the first

19   quarter of 2003, which AMD spent over 20 million yen designing. Shortly before the launch,

20   Fujitsu told AMD that Intel would not allow it to launch an AMD-powered commercial

21   notebook, and the project died. To this day, AMD remains locked out of Fujitsu's commercial

22   notebook lines. Intel's exclusionary conduct with Fujitsu extends beyond commercial

23   notebooks. In the consumer space, for example, Intel purchased total exclusivity for Fujitsu's

24   FM-Biblo NB consumer notebook line. When AMD tried to break Intel's lock on Fujitsu

25   notebooks by offering to match any Intel discount, Fujitsu made clear that there was no price

26   AMD could pay because Intel simply would not allow it. To this day, AMD remains locked

27   out of Fujitsu's Biblo line.

28

COMPLAINT

1  61. **Fujitsu-Siemens**. Fujitsu-Siemens, a European joint-venture, was once a
2  mainstay for AMD's desktop business, with AMD chips powering over 30% of Fujitsu-
3  Siemens' offerings in the consumer sector. In early 2003, Intel offered Fujitsu-Siemens a
4  "special discount" on Celeron processors which Fujitsu-Siemens accepted in exchange for
5  hiding its AMD computers on its website and removing all references to commercial AMD-
6  powered products in the company's retail catalog.

7  62. Intel has also succeeded in convincing Fujitsu-Siemens to impose market
8  restrictions on its AMD-powered PCs. Its parent, Fujitsu, currently sells an AMD-equipped
9  Lifebook S2010, a commercial notebook, but only in the U.S. and Japan. Fujitsu-Siemens has
10  declined AMD's plea to offer the machine in the European market as well. Similarly, Fujitsu-
11  Siemens designed for the European market the FMC Lifebook MG Series notebook. But it
12  refused to offer that computer in Asia or North America. Finally, although Fujitsu-Siemens
13  produces an AMD commercial desktop, the Scenico, it refuses to advertise it on its website,
14  offering it instead only as a build-to-order product. Having invested significantly to bring these
15  computers to market, Fujitsu-Siemens has been able to offer no explanation for its refusal to
16  exploit them worldwide. AMD's unit share of Fujitsu-Siemens' business recently fell below
17  30% for the first time in four years.

18  63. **NEC.** Intel was forced to relax its hold on NEC's business when long-
19  time NEC customer, Honda Motor Company, demanded that NEC supply it with servers
20  powered by AMD's Opteron microprocessors. After underwriting the considerable expense of
21  designing and manufacturing an Opteron server for Honda, NEC then inexplicably refused to
22  market the product to any of its other customers.

23  64. There is no reason, other than Intel's chokehold on the OEMs, for
24  AMD's inability to exploit its products in important sectors, particularly commercial desktops.
25  These computers, which large corporate customers buy in the tens of thousands at a time,
26  represent a lucrative opportunity for the supplier. Yet, the microprocessors that power them
27  are identical to microprocessors in consumer computers, a sector in which AMD has won both
28  praise and market share. The only material difference between the consumer and commercial

-23-

COMPLAINT

1  segments is that many more system builders supply desktops to consumers, making it more
2  difficult for Intel to control their microprocessor choice.

3      **3.    Exclusionary Rebates.**

4         65.    Intel has also imposed on OEMs a system of first-dollar rebates that have
5  the practical and intended effect of creating exclusive or near-exclusive dealing arrangements
6  and artificially foreclosing AMD from competing for a meaningful share of the market. In
7  general, the rebate schemes operate as follows: quarterly, Intel unilaterally establishes for each
8  of its customers a target level of purchases of Intel microprocessors. If the customer achieves
9  the target, it is entitled to a rebate on all of the quarter's purchases of all microprocessors—
10 back to the very first one—generally in the neighborhood of 8-10% of the price paid. Intel
11 provides the rebate in cash at the quarter's close. OEMs operate on razor-thin margins, so
12 qualifying for an Intel rebate frequently means the difference between reporting a profit or a
13 loss in the coming—and closely watched—quarterly earnings.

14        66.    In contrast to "volume discounts" that sellers offer on a graduated and
15 nondiscriminatory basis to reflect cost efficiencies that accrue when dealing in larger quantities,
16 Intel's is a system of "penetration" or "loyalty" rebates designed to exclude AMD from a
17 substantial portion of the market. Intel intentionally sets a rebate trigger at a level of purchases
18 it knows to constitute a dominant percentage of a customer's needs. It is able to develop
19 discriminatory, customer-by-customer unit or dollar targets that lock that percentage (without
20 ever referencing it) because industry publications accurately forecast and track anticipated sales
21 and because OEM market shares—which industry publications also report weekly, monthly and
22 quarterly—do not change significantly quarter to quarter.

23        67.    Intel's retroactive discounts can operate to price microprocessors so low
24 that AMD is put at a competitive disadvantage it cannot overcome. Consider an OEM which
25 anticipates purchasing 100 microprocessors that both Intel and AMD sell for $100 each. Intel
26 knows that because of its prior model introductions, the customer will have to buy 60 from
27 Intel. The customer considers buying its expected balance for its new models from AMD, but
28 Intel offers it a rebate that will entitle it to a 10% retroactive discount if, but only if, it

-24-

COMPLAINT

1  purchases 90 units or more. If the customer buys 30 of the 40 additional units from Intel to

2  qualify for the rebate, its incremental cost for the 30 will be $3,000 (30 units at $100/unit) less

3  the 10% rebate going back to the first unit it purchased, which amounts to $900 (90 units x

4  $10/unit), for a total of $2,100.

5        68.    AMD can only capture the 30 units if it offers a price that makes the

6  customer indifferent between getting the Intel rebate and getting an overall equivalent deal on

7  AMD microprocessors. Thus, for those 30 units, AMD would have to lower its price to $70

8  per unit (because 30 units x $70/unit equals the $2,100 net cost for buying from Intel). In

9  effect, the rebate forces AMD to charge $20 dollars less than the $90 discounted Intel price if it

10  attempts to get any business from the customer at all. That is because it is selling the customer

11  only 30 units over which it has to spread a $900 discount while Intel can spread it out over 90.

12  At the end of the day, this creates a serious competitive disadvantage for AMD. As shown in

13  the example, AMD is forced to discount its price three times as much as Intel just to match the

14  Intel discount—not because its processors are inferior—far from it—but because Intel has

15  assured for itself—by its past predatory practices—a significant base of assured demand which

16  enables Intel to inexpensively spread its first-dollar discount. Importantly, this new base of

17  demand—driven by the OEM's purchasing—will enable Intel to repeat its exclusionary practice

18  when the next line of models is unveiled.

19        69.    At least in the short run, most if not all of the major OEMs must engage

20  significantly with Intel: (1) because AMD is too small to service all their needs while

21  continuing to satisfy other customer demand; (2) because to meet customer expectations, OEMs

22  must assure commercial computer buyers that specifications, including the microprocessor, will

23  remain unchanged during the product's lifecycle; and (3) because Intel has encouraged end-

24  users to specify that processors be of the same family among similar computers in one

25  installation, as this is perceived to increase reliability (although technically this is not the case).

26  Intel uses its retroactive discounts to make its large, captive market share self-perpetuating. In

27  any one quarter, AMD cannot economically match Intel's retroactive rebate because it

28  competes for too small a share of the customer's volume over which to spread the dollars

COMPLAINT

1    necessary to equal the customer's total Intel cost savings. As a result, it loses the business and
2    thus goes into the next selling cycle with Intel imbedded in additional customer product over
3    which Intel can spread its rebates. This serves again to artificially constrain AMD's
4    opportunity to match Intel's ensuing round of retroactive discounts. Intel's intertemporal
5    leveraging of its market share effectively forecloses AMD from ever having a fair opportunity
6    to compete.

7           70.    Intel exacts a severe penalty from OEMs who fail to meet their targets.
8    For example, during the fourth quarter of 2004, AMD succeeded in getting on the HP retail
9    roadmap for mobile computers, and its products sold very well, helping AMD capture nearly
10   60% of HP's U.S. retail sales for the quarter. Intel responded by withholding HP's fourth
11   quarter rebate check and refusing to waive HP's failure to achieve its targeted rebate goal.
12   Instead, Intel "allowed" HP to make up the shortfall in succeeding quarters when HP promised
13   Intel at least 90% of HP 's mainstream retail business.

14          71.    Intel has deployed a variety of variants of this basic rebate scheme. In
15   the case of one European OEM, for example, Intel imposes the additional condition that the
16   customer purchase target volumes of specific processors, generally microprocessors against
17   which AMD's products compete particularly well. In the case of another, Intel offers as an
18   inducement discounted microprocessors rather than rebates. In the case of the European
19   division of one U.S. OEM, Intel has imposed a target of between 70-90% of the customer's
20   requirements. Rather than qualifying the customer for a cash rebate, however, meeting the
21   target entitle s the OEM to purchase designated processors at up to 20% below "normal" cost,
22   thereby enabling the customer to obtain favorable pricing on bundled products (*e.g.*, a
23   Centrino-series processor and chipset) and/or to receive product offerings not available to
24   competitors.

25          72.    Intel makes similar offers to smaller OEMs but they are generally
26   unwritten, and Intel leaves undefined the consequences of failing to meet a target. Thus, a
27   customer falls short at its peril, knowing only that it may lose its account with Intel and have to
28

-26-

COMPLAINT

1   source future products from Intel distributors, which is both more expensive and provides less
2   security of supply than direct purchase.

3          73.     The salient features of all of Intel's rebate schemes are that they are
4   discriminatory and market-foreclosing. If the customer chooses to purchase any significant
5   quantity of microprocessors from AMD, it will not qualify for its rebate, and its price will be
6   higher on all the Intel processors it buys across the board. By tailoring targets to each
7   customer's size and anticipated volume, Intel locks up significant percentages of the market
8   much more effectively and at a lesser cost to itself—but to a greater harm to AMD and
9   ultimately consumers—as compared to offering such rebates for comparable purchase levels to
10   all customers on a nondiscriminatory basis.

11          74.     Intel's use of retroactive rebates leads, in some cases, to below-cost
12   pricing on incremental sales. The following example shows why a customer's incremental cost
13   of purchasing from Intel those units that both Intel and AMD could supply (the "contested
14   sales") can be zero or even negative—a price AMD cannot match. Consider an OEM which
15   has purchased 90 units of Microprocessor A at $100 per unit under an Intel rebate scheme that
16   entitles it to a 10% first-dollar discount but only after it purchases more than 90 units. Its cost
17   for the 90 processors is $9,000. The OEM is now considering an additional purchase of a
18   further 10 units. If it makes the additional purchase from Intel, the OEM will meet the
19   expenditure condition and will qualify for the 10% per unit discount on all units. Accordingly,
20   the total spent will remain $9,000. The incremental cost of the 10 additional
21   microprocessors—as well as Intel's incremental revenue—will be zero (the $1,000 additionally
22   spent, less the $1,000 thereby saved). In other words, this scheme leads to incremental units
23   being offered to the OEMs for nothing, leaving AMD hopelessly boxed out.

24          75.     Importantly, even if Intel were to earn some incremental revenue on
25   these marginal units, these additional revenues could be below the incremental cost of their
26   production. As a result, Intel's additional profit on the sale would be negative, but for the fact
27   that it had a long-run exclusionary effect on AMD. (Obviously, if Intel earns no revenues on
28

-27-

COMPLAINT

1  its additional sales, it has to be foregoing profits.) As this analysis shows, some of Intel's

2  discriminatory, retroactive rebates amount to unlawful, predatory below-cost pricing.

3          76.    Even where Intel's prices are above cost on the incremental volumes and

4  overall despite its retroactive rebate schemes, these rebates enable Intel to lower prices

5  selectively in the contested market segment while maintaining higher prices in its captive

6  market. For example, Intel can offer rebates which are granted across the entire volume of

7  sales but which are triggered only if the OEM increases its purchases beyond the portion of its

8  requirements which is captive to Intel. Indeed, Intel can even price above the "monopoly"

9  level for the volumes below the benchmark and offer huge discounts for additional purchases

10  knowing full well that the OEM will not buy less than the benchmark and, instead, source the

11  overwhelming share of its purchases from Intel thereby "qualifying" for the putative rebate

12  while at the same time denying AMD any reasonable volume opportunity.

13          77.    The use of retroactive rebates to limit AMD to a small share of an

14  OEM's business heightens the obstacle to inducing the OEM to launch AMD-powered

15  platforms. OEMs incur substantial expense in designing and engineering a new computer, and

16  make the investment only if they foresee a substantial chance of selling a sufficient volume to

17  recoup it. Intel's rebate and other business strategies effectively cap the volumes of AMD-

18  powered products that an OEM can sell. Hence, Intel's practices exacerbate normal

19  impediments to entry and expansion.

20      **4.**    **Threats of Retaliation.**

21          78.    Beyond exclusive dealing, product and channel restrictions and

22  exclusionary rebates, Intel has resorted to old-fashioned threats, intimidation and "knee-

23  capping" to deter OEMs from dealing with AMD. Intel has a variety of pressure points at its

24  disposal: it can unilaterally reduce or withdraw a discount, rebate or subsidy; it can impose a

25  discriminatory price increase on a disfavored customer, extend a price cut to that customer's

26  competitor, or force retailers into dropping the customer's computers and buying from its

27  competitor instead; or it can delay or dispute an allowance or rebate—all of which can turn a

28  profitable quarter for an OEM into an unprofitable one. Other pressure points on accounts it

-28-

1  deems disloyal include threatening to delay or curtail supplies of scarce processors or essential
2  technical information. Examples abound.

3         79.    As Gateway executives have recounted, Intel's threats beat them into
4  "guacamole." But Gateway is not alone. Prior to its merger with HP, Compaq Computer
5  received Intel threats every time it engaged with AMD. In late 2000, for example, Compaq's
6  CEO, Michael Capellas, disclosed that because of the volume of business he had given to
7  AMD, Intel withheld delivery of server chips that Compaq desperately needed. Reporting that
8  "he had a gun to his head," Capellas informed an AMD executive that he had to stop buying
9  AMD processors.

10        80.    In 2002, Intel pointed its gun at NEC. Intel threatened to discontinue
11 providing NEC with the technological roadmap of future Intel products if NEC did not convert
12 its entire line of Value Star L computers to Intel microprocessors. Without that roadmap, NEC
13 would be at a distinct competitive disadvantage. Predictably, NEC succumbed and eliminated
14 AMD from the Value Star L series in 2002 and 2003.

15        81.    NEC's European subsidiary, NEC-CI, which operates NEC's European
16 and non-Japanese Asian divisions, reported that Intel executives said they would "destroy"
17 NEC-CI for engaging with AMD in the commercial desktop segment. Intel told NEC-CI's
18 retailers that NEC-CI's AMD dealings could impair its ability to supply products to its
19 customers, and when NEC-CI resisted the pressure, Intel imposed a discriminatory price
20 increase.

21        82.    AMD had been engaged in discussions with IBM about introducing an
22 Opteron "blade" server, when IBM suddenly announced that any such product it distributed
23 could not bear an IBM logo. When pressed for an explanation, IBM reported that it could not
24 appear overly supportive of AMD server products because it feared Intel retaliation.

25     **5.    Interference with AMD Product Launches.**

26        83.    Key to gaining quick market acceptance of a new microprocessor is a
27 chipmaker's ability to develop a lineup of reputable launch partners, consisting of OEMs
28 prepared to roll out products featuring the chip, major customers who are willing to buy and

-29-

1    embrace it, and other industry allies, such as major software vendors and infrastructure

2    partners who can attest to its quality and reliability. Particularly for commercial and enterprise

3    (*i.e.*, server-work station) purchasers, a successful and impressive "launch" is essential to

4    generating confidence among the computer professionals who will be the potential audience for

5    the new microprocessor.

6         84.    Aware of the importance of product launches, Intel has done its utmost to

7    undermine AMD's. Set forth below are several examples.

8         85.    AMD's September 23, 2003, launch of Athlon64 was a watershed event

9    for the Company. Upon learning the launch schedule, Intel did its best to disrupt it. For

10   example, Acer committed to support the AMD rollout by making a senior executive available

11   for a videotaped endorsement and by timing the introduction of two computers, a desktop and a

12   notebook, to coincide with AMD events planned for Cannes, San Francisco and Taiwan. Days

13   before the event, Intel CEO, Craig Barrett, visited Acer's Chairman, CEO and President in

14   Taiwan, expressed to them Intel's "concern" and said Acer would suffer "severe

15   consequences" if it publicly supported AMD's launch. The Barrett visit coincided with an

16   unexplained delay by Intel providing $15-20 million in market development funds owed to

17   Acer. As a result, Acer withdrew from the launch in the U.S. and Taiwan, pulled its

18   promotional materials, banned AMD's use of the video, and delayed the announcement of its

19   Athlon64-powered computers. Acer's President subsequently reported that the only thing

20   different about Intel's threats was the messenger—they were "usually done by lower ranking

21   managers," not Intel's CEO.

22        86.    HP also withdrew precipitously from the Athlon64 launch after

23   committing to participate. HP had agreed to support the launch by producing a promotional

24   video and by sending senior executives to all three launch sites. Just before launch, however,

25   HP manager, John Romano, pulled the video and announced that HP would only be sending a

26   junior manager, and then only to Europe.

27        87.    Other AMD customers and channel partners reporting Intel coercion to

28   withdraw from the Athlon64 launch were Lenovo, NEC-CI and Best Buy.

-30-

COMPLAINT

1    88.    Intel also disrupted AMD's launch of its Opteron server chip, which was
2  rolled out on April 22, 2003, with few in attendance and little industry support. A computer
3  industry journal reported Intel's fingerprints: "They all [vendors] told me that prior to the
4  launch, they received a phone call from Intel. Intel asked if they were going to the launch. If
5  they replied yes, the Intel rep asked them if it was 'important to them to go', or 'if they really
6  wanted to go.' Pressing the vendors, I got the same response, 'Intel is too smart to threaten us
7  directly, but it was quite clear from that phone call that we would be risking our various
8  kickback money if we went.'" (<http://www.theinquirer.net/?article=91397>.)

9    89.    Other companies that reported being intimidated from participating in the
10  Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens. Indeed, Intel representatives
11  told Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they
12  attended, they would be the only Tier One OEM showing its support as all of the others would
13  back out. With the exception of IBM, Intel was right.

14    90.    These are not isolated examples, but rather illustrations of Intel's
15  relentless campaign to undermine marketing efforts by its one remaining competitor. For
16  example, IBM pulled its AMD-powered computers from the 2004 Palisades eServer and PC
17  Show, citing a contractual agreement with Intel said to prohibit it from endorsing those
18  competitive products. And at the 2004 Super Computing Show, an annual conference devoted
19  to high performance computing, Intel offered two other AMD customers money to remove
20  AMD systems from their booths. At CeBit, Intel threatened to pull a half million dollars of
21  support from Fujitsu-Siemens for displaying AMD products (which were removed).

22    **6.    Product Bundling.**

23    91.    Intel also uses product bundling as an exclusionary weapon in a variety of
24  ways. Intel's most common deployment is in bidding for a new OEM platform: it bundles
25  microprocessors with free (or heavily discounted) chipsets or motherboards, often offered in
26  amounts exceeding the OEM's requirements for the new platform. (The excess, of course, is
27  only compatible with Intel processors, thereby providing the OEM a strong inducement to go
28  with Intel rather than AMD on uncommitted models.). AMD does not sell chipsets or

-31-

1 motherboards; they are provided by independent suppliers such as ATI, nVidia and Via which

2 incur their own costs and control their own pricing. Hence, to match Intel's bundled

3 microprocessor-chipsets-motherboards offer, AMD must extend a discount on its

4 microprocessors that will not only match any Intel discount on the microprocessors themselves

5 but also will compensate the OEM for the savings it will lose on independent Intel chipset and

6 motherboard purchases. The additional compensation AMD is forced to provide through a

7 discount on the sale of microprocessors alone makes AMD's sale of microprocessors

8 potentially unremunerative, and it also enables Intel to avoid competing with AMD directly on

9 microprocessor price and quality by imposing disproportionate burdens on AMD that are

10 wholly unrelated to AMD's product quality which, as has been demonstrated, is frequently

11 superior to that of Intel's.

12        92. As retaliation for dealing with AMD, Intel has also used chipset pricing

13 as a bludgeon. For example, in 2003, Acer had committed to launch the AMD Athlon XP.

14 Acer executives worldwide had been working with AMD to bring the product to market post-

15 launch. But, on the eve of the launch the Acer management in Taiwan pulled the plug. AMD

16 learned from Acer executives that Intel had threatened to raise chipset prices by \$10 on all

17 Intel-based Acer systems if any processor business was awarded to AMD outside of Europe.

18       93. Intel's dealings with OEMs are unlawfully exclusionary, have no pro-

19 competitive justification, and are intended to maintain its monopoly with resultant injury to

20 consumers.

21 **B. Practices Directed At Distributors.**

22       94. Intel uses many of the same tactics it practices on OEMs to restrict

23 distributors from carrying AMD processors or selling AMD products into markets it deems

24 strategic. For example, it entered into an exclusive deal with Synnex, which is one of the

25 largest U.S. distributors. Given Intel's 80% plus market share, there is no pro-competitive

26 justification for this arrangement.

27       95. As with OEMs, Intel offers discounts and rebates to distributors on the

28 condition that they not do business with AMD, either worldwide or in strategic sub-markets.

-32-

COMPLAINT

1  For example, in December of 2004, Ingram Micro, Intel's biggest distributor in China,
2  suddenly cut off discussions to distribute AMD chips as well. A high-ranking Ingram Micro
3  official later reported to AMD that Ingram Micro had no choice because Intel proffered loyalty
4  rebates that were too lucrative to pass up.

5        96.    Intel also offers a panoply of special programs for distributors who carry
6  Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for
7  new customers (credits that can be used for all products from Intel and any other suppliers),
8  payment for normal freight charges, and special inventory assistance such as credits to offset
9  inventory costs. When such more nuanced means of achieving exclusivity fail, Intel has simply
10  bribed distributors not to do business with AMD. For example, a high-ranking Tech Data
11  executive turned down $1 million to stop doing business with AMD, which caused the Intel
12  representatives to ask, "How much would it take?"

13        97.    Intel also offers retroactive rebates triggered when a distributor reaches a
14  prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict economic
15  punishment on those who do too much AMD business. But, unlike OEMs, distributors remain
16  ignorant of the goals Intel has set for them or the precise consequences of failing to meet them.
17  Intel does not share this information with them; they simply receive a check at the end of a
18  quarter. As a result, every AMD chip they purchase, they buy at their peril.

19        98.    Finally, those distributors who choose to do business with AMD have
20  been conditioned to expect Intel retaliation. For example, when ASI, one of the largest
21  computer hardware and software distributors, began distributing AMD processors, Intel
22  demanded that it exclude AMD personnel from its ASI Technology Shows and its General
23  Managers' meetings. Until recently, ASI refused master distributor status from AMD, despite
24  the financial benefits attached, because it feared that such a public alignment with AMD would
25  trigger Intel retaliation. When, in January of 2005, it finally accepted Master Distributor
26  status, Intel began reducing the level of market development funds ASI received.

27        99.    Avnet Inc., one of the world's largest computer equipment distributors
28  and an avid AMD supporter, has also received its share of Intel intimidation. Thus, Avnet

-33-

1     cited Intel as the reason it could not distribute AMD parts to the industrial sector. And when

2     AMD launched its Opteron server chip, Intel made clear it would make it "painful" for Avnet

3     were it to begin distributing that chip. When Avnet did so anyway, Intel threatened to cut if

4     off. Another distributor got even worse treatment. In retaliation for Supercom's AMD

5     dealings in Canada, Intel pressured Supercom's customers to switch to another distributor.

6            100.    These are not the only distributors that Intel has attempted to coerce from

7     doing business with AMD. Others include R.I.C. in Germany, Paradigit in the Netherlands,

8     and Quote Components, also in the Netherlands.

9            101.    Intel's dealings with distributors are unlawfully exclusionary, have no

10     pro-competitive justification, and are intended to maintain its monopoly.

11    **C.     Practices Directed At Retailers.**

12            102.    In both the U.S. and internationally, approximately one fifth of desktop

13     and notebook computers is purchased at retail stores. A handful of retailers dominate the U.S.

14     PC market: Best Buy and Circuit City are the largest. Other significant but smaller retailers

15     are Walmart/Sams Club, Staples, Office Depot and Office Max.

16            103.    Most of the PCs sold at retail are sold during four or five "buying

17     seasons" that correspond to events on the calendar ("Dads and Grads," "Back to School,"

18     "Holiday," etc.), and retailers refresh their inventory for each. A chipmaker faces a two-step

19     process to get its platform on retail shelves: first, it must convince one or more OEMs to build

20     machines using its microprocessor at a suggested price point (called "getting on the roadmap");

21     and second, it must convince the retailer to stock and devote shelf space to these machines.

22     Shelf space does not come for free. The major retailers demand market development funds

23     ("MDF") in exchange. MDF can consist of cooperative advertising support, but more

24     frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of

25     thousands of dollars, for example, space in a Sunday circular, an in-store display or an internet

26     training opportunity with the chain's sales staff. The MDF required to secure shelf space can

27     run as high as $25 per box depending on the computer price point and how urgently the

28     competing chipmakers want the shelf space.

-34-

COMPLAINT

1       104.    Intel has historically enjoyed an advantage over AMD at retail because,

2  using many of the strategies described above, it has had greater access to the OEMs' roadmaps

3  and the ability to exert pressure to keep AMD out of their product plans.  Also, it has

4  significantly greater financial resources with which to buy retail shelf space.

5       105.    But to leverage those advantages, Intel has also made exclusive deals

6  with many key retailers around the world.  For example, until recently Office Depot declined

7  to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its

8  "premier" status with Intel that would be put at risk.  Fry's is Fujitsu's only retailer in the

9  United States.  When Intel learned that Fry's was very successfully marketing a Fujitsu's

10  Athlon™ XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

11       106.    The story is even worse in Europe.  AMD has been entirely shut out

12  from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's

13  retail sales.  Intel provides Media Markt between \$15-20 million of MDF annually, and since

14  1997 Media Markt has carried Intel computers exclusively.  Intel subsidies also foreclose AMD

15  from Aldi, a leading German food retail chain, whose PC sales account for an additional 15-

16  20% of the German market.

17       107.    In the United Kingdom, Intel has locked up substantially all of the

18  business of DSG (Dixon Services Group), operator of three major chains including Dixon and

19  PC World that collectively account for two thirds of the U.K. PC market.  In exchange for

20  Intel payments, DSG has agreed to keep AMD's share of its business below 10%.  Like Media

21  Markt, DSG reports that Intel penalizes it with reduced MDF just on account of the small

22  amount of business it does with AMD.  Toys 'R' Us in the U.K. is also exclusive to Intel.

23  Time, another U.K. retailer (which builds computers as well), took a substantial MDF payment

24  from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it

25  reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64

26  desktop models.  In France, Intel has brought pressure on the largest retailers, including

27  Conforama, Boulanger, causing them to cease dealing with AMD or drastically reduce their

28  AMD business.

COMPLAINT

1    108.    AMD has nonetheless made some progress in gaining retail market share.
2  Because of price/performance advantages, which are key in retail, OEMs build approximately
3  15% of their U.S. domestic market desktops with AMD processors; within notebook
4  roadmaps, AMD represents approximately 10%. On a shelf-space to sales basis, AMD has
5  generally outperformed Intel. For instance, in the desktop segment during the fourth quarter of
6  2004, AMD-equipped computers captured between a 33%-38% share of Circuit City's sales,
7  despite being limited to five of the 25 models (20%) on the Circuit City shelves. And with
8  approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD
9  computers accounted for roughly 30% and 22% of their sales, respectively. These numbers
10  confirm that AMD's products perform well at retail, provided that space is available.

11    109.    In fact, Intel's sales staff was instructed "not to let this happen again."
12  As a result, Intel instituted a rebate program similar to what it foisted on OEMs, with similar
13  exclusionary effect. Under this program, Intel provides full MDF payments to retailers, such
14  as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted
15  to AMD35 based products, but also the share of revenues they generate from selling AMD
16  platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel
17  is cut by 33% across all products.

18    110.    This is how the program works at Circuit City. If less than 20% of
19  Circuit City's notebook revenue derives from AMD-based computers (30% for desktops), Intel
20  has agreed to pay Circuit City $15 in MDF per Intel-powered machine; but if the AMD
21  percentage reaches or exceeds 20%, Circuit City's MDF subsidy is cut to $10. This creates a
22  $5 per box "tax" on the retailer for doing 20% or more of its dollar volume with AMD-
23  powered machines; and this "tax" is applicable to all of the Intel-powered machines that the
24  retailer buys, back to the very first machine.

25    111.    The following illustrates the competitive disadvantage this creates for
26  AMD: if Circuit City were to purchase only Intel-powered notebooks for its 200,000-unit
27  inventory in a quarter, Intel would pay it $15 of MDF per computer, or a total of $3 million.
28  However, if Circuit City were to reduce its purchases of Intel-based notebooks to 80%

-36-

COMPLAINT

1   (160,000 units) so that it could stock a modest number of AMD-powered computers, Intel

2   MDF would fall to $1.6 million ($10 MDF/unit times 160,000 units). Were AMD to match

3   Intel's $10 per unit MDF on the 40,000 unit s it supplied, Circuit City would receive an

4   additional $400,000, bringing its total MDF to $2 million, leaving it $1 million worse off for

5   doing business with AMD. For AMD to make Circuit City "whole," it would have to vastly

6   increase its MDF on its 20% share to $35 MDF per unit (40,000 x $35 = $1.4M), which

7   together with Intel's $1.6 million would bring the total MDF back to $3 million. In other

8   words, to just capture a 20% share, AMD must offer two or three times as much MDF as

9   Intel—because it has far fewer units over which to spread the difference. Given these perverse

10  economies, Circuit City is not likely to allocate less than 80% of its notebook sales to Intel,

11  even if it means taking AMD stock off the shelves at the end of a quarter. (Indeed, to avoid

12  inadvertently running afoul of the limitation, a prudent distributor would keep AMD's share

13  well short of 20%.)

14          112.    Nor is Intel above threatening retailers to gain preferred treatment. For

15  example, at the recent CeBit computer show in Hanover, Germany (the largest computer show

16  in the world), a German chain, Vobis, hung an AMD Turion64 banner from its booth as part of

17  a co-marketing agreement with AMD and its OEM partner (Yakamo) to announce AMD's new

18  mobile microprocessor. Intel's German general manager and its vice president for mobile

19  products demanded that the Turion64 banner be removed. When Vobis' CEO declined, the

20  Intel representatives threatened immediately to stop microprocessor shipments to Vobis '

21  supplier. The banner was removed before the CeBit show opened.

22          113.    Intel's dealings with retailers are unlawfully exclusionary, have no pro-

23  competitive justification, and are intended to maintain its monopoly.

24  **D.      Intel's Standard Setting and Other Technical Abuses.**

25          **1.      Intel's Exclusion of AMD from Industry Standards.**

26          114.    Companies within the computer industry often agree to design certain

27  aspects of their products in accordance with industry standards to ensure broad compatibility.

28  Indeed, standards are not only ubiquitous in the computer industry, they are essential. But

-37-

COMPLAINT

1  when a company is unfairly excluded from the standards-setting process or is denied timely
2  access to the standard, competition can be restrained in a way that reverberates throughout the
3  entire market. Intel has employed, and continues to employ, a variety of tactics that have the
4  purpose and effect of excluding and/or hampering AMD's full and active participation in the
5  development of important industry standards. It has also worked to deny AMD timely access
6  to such standards. Its efforts have hampered AMD's ability to vigorously compete in the
7  market.

8       115.  By way of example, Intel and AMD each develop and manufacture
9  memory controller technologies that allow their processors and related components to
10  communicate with memory. Intel designs and manufactures an entirely separate chip for this
11  purpose, known as the Graphics and Memory Controller Hub, but AMD embeds its memory
12  controllers directly into its processors, thus dispensing with the need for an extra chip and
13  speeding up communication. Both companies need to know and have access to memory
14  standards well in advance of producing their processors and/or chipsets so that their memory
15  controller designs will be compatible with the next generation of memory devices.

16       116.  The Joint Electron Device Engineering Council ("JEDEC") is the
17  industry organization responsible for the standards governing the most recent generations of
18  computer memory chips. Even though JEDEC was already developing the standards for the
19  next generation of memory chips, Intel convened a secret committee that it dubbed the
20  Advanced DRAM Technology ("ADT") Consortium to develop a competing memory standard.

21       117.  The ADT Consortium was cleverly structured with multiple tiers of
22  membership, each with different levels of access to information. The majority of companies
23  were consigned to the lowest tier, meaning that they would receive access to the memory
24  standard only upon its completion, but not during its development. The actual development
25  effort was undertaken by companies with the highest tier membership status, which Intel
26  reserved for itself and the major memory manufacturers. No other companies were allowed
27  input or full access to the standard during its development by the ADT Consortium.

28

-38-

1            118.   AMD desperately needed access to the developing standard, and input

2 into its definition, in order to be able to launch a microprocessor with updated memory

3 controller technology at the same time as Intel. AMD lobbied repeatedly for higher tier

4 membership status, but was continually turned down. Intel had structured the ADT

5 Consortium's rules to require a unanimous vote—a rule that gave Intel veto power—over any

6 decision to allow AMD to join the development committee; and it used that veto power to cause

7 the Consortium arbitrarily to reject AMD's application.

8            119.   By foreclosing AMD from input or access to the memory standard during

9 its development process, Intel deliberately placed AMD at a severe competitive disadvantage.

10 As a consequence of its exclusion, AMD had no opportunity to monitor participants'

11 suggestions and to object to Intel-proposed features that were without substantial benefit to

12 consumers and were instead motivated by Intel's desire to disadvantage AMD's microprocessor

13 architecture. Furthermore, by keeping the ADT Consortium memory standard-setting process

14 shrouded in secrecy, Intel was able to gain a significant head start. While the ADT

15 Consortium was ultimately unsuccessful in implementing an industry standard, this type of

16 exclusionary conduct exemplifies Intel's attempts to use industry standard-setting to

17 competitively disadvantage AMD in an unlawfully exclusionary manner.

18            120.   Indeed, Intel is attempting a repeat performance with respect to a new

19 memory standard, this time excluding AMD by avoiding the open standard-setting committee

20 entirely. Intel is currently coercing the major memory producers into signing non-disclosure

21 agreements and working exclusively with Intel in a "secret" committee to develop the next

22 generation memory interface standard. Once under this agreement, the memory manufacturers

23 are prohibited from sharing information about their own product designs implementing the

24 memory interface standard. This has the effect of preventing AMD from completing the design

25 of its processor memory controllers until Intel permits memory manufacturers to communicate

26 their interface specifications to the industry.

27

28

COMPLAINT

1    121.    By this scheme, Intel tightens its control over the industry by converting

2  what the component manufacturers intend as a public standard into a proprietary one, and

3  thereby guarantees itself an undeserved head-start and unfair competitive advantage.

4        **2.    Intel's Promotion of Industry Standards that Disadvantage AMD.**

5        122.    Even where it has been unable to exclude AMD from participating in the

6  development of industry standards, Intel has attempted to drive the adoption of standards

7  having no substantial consumer benefit and whose sole or dominant purpose was to

8  competitively disadvantage AMD based on its highly integrated microprocessor architecture.

9        123.    As an example, in 2004, JEDEC began developing standards governing

10  the design of the memory modules for next generation ("DDR3") memory devices.  These

11  modules, known as dual inline memory modules, or "DIMMs," consisted of printed circuit

12  boards upon which a number of memory chips were mounted.  The DIMMs connected the

13  memory chips to the computer's motherboard through a series of metal connectors known as

14  "pins."  One purpose of the JEDEC standards was to define the functions of these pins so as to

15  enable chipmakers to design compatible memory controllers that would allow their

16  microprocessors and the memory on the DIMMs to communicate.

17        124.    The JEDEC committee, which consists of members representing

18  companies throughout the computer industry, had already adopted a scheme for defining the

19  pins for the previous generation ("DDR2") DIMMs used in desktop and laptop computers.

20  When the JEDEC committee began work on standards for DDR3 memory modules for desktop

21  computers, Intel proposed that the committee adopt a pin definition similar to that used for the

22  DDR2 memory modules.  This proposal made perfect sense, as Intel explained to the

23  committee, because it allowed DDR3 memory controllers to be compatible with DDR2 and

24  DDR3 memory modules.

25        125.    However, when the JEDEC committee began to define the pins for

26  DDR3 laptop memory modules in this consistent manner, Intel completely reversed its position,

27  counter proposing instead that the committee rearrange the pin definitions.  Intel's proposal had

28  no discernable technical merit or basis.

COMPLAINT

1    126.    In fact, Intel's motivation for proposing modification of the laptop

2    memory module pin definition was to competitively disadvantage AMD. Any modification to

3    the laptop memory module pin definition would require Intel and AMD to make corresponding

4    modifications of their memory controllers. AMD's microprocessor design, while representing

5    a huge breakthrough in integration, embeds the memory controller directly into its

6    microprocessor. While this produces significant computing advantages, modification of an

7    embedded memory controller requires significantly more time and expense.

8    127.    Knowing this vulnerability, Intel proposed its modified DDR3 memory

9    module pin definition for laptop computers for the purpose of delaying AMD's introduction of

10   a technologically superior part. While Intel's proposal was ultimately rejected by the JEDEC

11   committee, confirming the proposal's complete lack of technical merit, this is yet another

12   example of how Intel has attempted to drive industry standards to achieve its exclusionary ends.

13   **3.    Intel's Leveraging of Its Other Product Lines to Unfairly Disadvantage**

14   **AMD in the Marketplace.**

15   128.    Intel has also designed and marketed microprocessor-related products

16   with the goal of compromising performance for those who opt for AMD solutions, even if it

17   requires sacrificing its own product quality and integrity.

18   129.    An example is Intel's compilers. Generally, independent software

19   vendors ("ISVs") write software programs in high-level languages, such as C, C++, or

20   Fortran. Before these programs can be understood by a computer system, they must be

21   translated into object code—a machine-readable language—by a software program called a

22   compiler. Different companies write compilers for different operating systems (Windows,

23   Linux, etc.) and for different programming languages (C, C++, Fortran, etc.). Intel offers

24   compilers for use with a variety of different operating systems and programming languages.

25   130.    Intel's compilers are designed to perform specialized types of

26   optimizations that are particularly advantageous for ISVs developing software programs that

27   rely heavily upon floating point or vectorized mathematical calculations. Such programs

28   include, for example, mathematical modeling, multimedia, and video game applications.

-41-

COMPLAINT

1    131.   Intel has designed its compiler purposely to degrade performance when a
2    program is run on an AMD platform. To achieve this, Intel designed the compiler to compile
3    code along several alternate code paths. Some paths are executed when the program runs on an
4    Intel platform and others are executed when the program is operated on a computer with an
5    AMD microprocessor. (The choice of code path is determined when the program is started,
6    using a feature known as "CPUID" which identifies the computer's microprocessor.) By
7    design, the code paths were not created equally. If the program detects a "Genuine Intel"
8    microprocessor, it executes a fully optimized code path and operates with the maximum
9    efficiency. However, if the program detects an "Authentic AMD" microprocessor, it executes
10   a different code path that will degrade the program's performance or cause it to crash.

11   132.   ISVs are forced to choose between Intel's compilers, which degrade the
12   performance of their software when operated with AMD microprocessors, or third-party
13   compilers, which do not contain Intel's particular optimizations. Sadly for AMD and its
14   customers, for legitimate reasons Intel's compilers appeal to certain groups of ISVs, especially
15   those developing software programs that rely heavily on floating point and vectorized math
16   calculations. Unbeknownst to them, performance of their programs is degraded when run on
17   an AMD microprocessor not because of design deficiencies on the part of AMD, but
18   deviousness on the part of Intel.

19                    **IX.    EFFECTS OF INTEL'S MISCONDUCT**

20   133.   Intel's unlawful conduct has caused and will continue to cause substantial
21   harm to competition in the market for x86 microprocessors in domestic, import, and export
22   trade. Were it not for Intel's acts, AMD and others would be able to compete for
23   microprocessor business on competitive merit, both domestically and internationally, bringing
24   customers and end-product consumers such as plaintiff, lower prices, enhanced innovation, and
25   greater freedom of choice.

26   134.   Intel's anticompetitive acts both inside and outside the territorial
27   boundaries of the United States have a direct, substantial, and reasonably foreseeable effect on
28   trade and commerce that is not trade and commerce with foreign nations, and on United States

-42-

1 | trade and commerce. In maintaining its monopoly by unlawfully denying rivals a competitive
2 | opportunity to achieve minimum levels of efficient scale, Intel must necessarily exclude them
3 | from the product market world wide. As the domestic U.S. market is an integral part of the
4 | world market, successful monopolization of the U.S. market is dependent on world market
5 | exclusion, lest foreign sales vitalize a rival's U.S. competitive potential.

6 |        135.   Intel's conduct throughout the world has caused and will continue to
7 | cause substantial harm to the business of AMD in the domestic, import, and export trades, in
8 | the form of artificially constrained market share, lost profits and increased costs of capital.
9 | Additionally, that same conduct has had, and will continue to have, a direct, substantial, and
10 | reasonably foreseeable effect on AMD's ability to sell its goods to foreign customers in
11 | restraint of its U.S.-based and directed business, including its U.S. export business. These
12 | harms are evidenced by the following:

13 |      • When AMD first entered the server market in 2002 with its Athlon
14 | microprocessor—a part designed for desktops, not servers—the small OEMs and
15 | white-box vendors deploying the chip nonetheless managed to secure
16 | approximately 3% of the worldwide server market. AMD introduced its next
17 | generation Opteron microprocessor for servers the following year, and the chip
18 | won rave reviews and passionate customer testimonials, including Best of Show
19 | at the June 2003 ClusterWorld Conference and Expo and Best Processor award
20 | in July of 2003 from *InfoWorld*. Nonetheless, by means of its exclusionary and
21 | anticompetitive conduct, as of the fourth quarter of 2004, Intel had limited
22 | AMD's worldwide server market share to less than 5%, not appreciably more
23 | than before it introduced the Opteron.

24 |      • Intel's exclusionary conduct has successfully boxed AMD out of the notebook
25 | sector. Its exclusive deals with Dell, Sony and Toshiba alone bar AMD from a
26 | third of the world market and half of U.S. domestic sales. Intel's economic
27 | coercion and fidelity rebates have foreclosed AMD from an appreciable share of
28 | the remainder.

-43-

1      • AMD's Athlon64 is widely recognized as fully competitive with Intel's best
2          desktop offering with the added benefit that it can run 64-bit software.
3          Nonetheless, with the exception of a channel-restricted HP machine and a single
4          Fujitsu-Siemens' model, AMD has failed to get a single major OEM—which
5          collectively dominate the lucrative commercial desktop sector—to launch broadly
6          an Athlon64 commercial desktop. Fortune 500 companies won't take a chance
7          on AMD unless it partners with a Tier One desktop OEM, but Intel's
8          exclusionary conduct, including its economic coercion of Dell, HP, IBM,
9          Gateway and Acer, prevents that from happening. As a result, AMD's
10         commercial desktop share is no greater now than it was in 2002.

## X.    FIRST CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act)

13     136.    Plaintiff incorporates and realleges, as though fully set forth herein, each
14  and every allegation set forth in the preceding paragraphs of this complaint.

15     137.    The x86 Microprocessor Market is a relevant product market within the
16  meaning of the antitrust laws.

17     138.    The relevant geographic market is the world and a relevant geographic
18  submarket is the United States.

19     139.    Intel possesses monopoly power in the relevant market, maintaining a
20  market share of over 90% by revenue and 80% by unit volume.

21     140.    Substantial barriers to entry and expansion exist in the relevant market.

22     141.    Intel has the power to control prices and exclude competition.

23     142.    Intel has engaged in conduct with anticompetitive effects: (a) to
24  unlawfully maintain and enhance its monopoly in the relevant market and to keep prices high;
25  and (b) to stifle competition and to eliminate consumer choice through unlawfully exclusionary
26  behavior designed to keep AMD weak, undersized, and unable to achieve a minimum efficient
27  scale of operation needed to become a viable substitute for Intel with respect to significant

28

-44-

1 | customers, or to an essential portion of the market. It has done so with the intent to maintain
2 | its monopoly in the relevant market.

3 |      143. Intel has also combined or conspired with others, including others
4 | identified above, to monopolize the market for x86 microprocessors in the United States and
5 | elsewhere.

6 |      144. There is no legitimate business justification for Intel's conduct.

7 |      145. Plaintiff and the members of the Class have been injured and will
8 | continue to be injured in their business and property by paying more for x86 microprocessors
9 | purchased indirectly from Intel than they would have paid and will pay in the absence of the
10 | Intel's unlawful acts, including paying more for personal computers and other products in
11 | which x86 microprocessors are a component as a result of higher prices paid for x86
12 | microprocessors by the manufacturers of those products.

13 |      146. Plaintiff and the members of the Class are entitled to an injunction
14 | against Intel, preventing and restraining the violations alleged herein. Plaintiff and members of
15 | the Class have no adequate remedy at law for Intel's ongoing or threatened conduct.

16 |      **XI.   SECOND CLAIM FOR RELIEF**

17 |      **(Violation of California's Cartwright Act)**

18 |      147. Plaintiff incorporates and realleges, as though fully set forth herein, each
19 | and every allegation set forth in the preceding paragraphs of this Complaint.

20 |      148. Intel's unlawful conduct was centered in, carried out, effectuated and
21 | perfected mainly within the State of California, and Intel's conduct within California injured all
22 | members of the Class throughout the United States. Therefore, this claim for relief under
23 | California law is brought on behalf of all members of the Class, whether or not they are
24 | California residents.

25 |      149. Intel and certain co-conspirators entered into and engaged in a continuing
26 | unlawful combination, trust, agreement, understanding and concert of action in restraint of the
27 | trade and commerce described above in violation of Section 16720 of the California Business
28 |

-45-

COMPLAINT

1  and Professions Code. Intel and others have agreed, combined and conspired in violation of

2  Section 16720 to monopolize the x86 processor market through unlawful means.

3        150.    The aforesaid violations of Section 16720 of the California Business and

4  Professions Code consisted, without limitation, of a continuing unlawful combination, trust,

5  agreement, understanding and concert of action between Intel and its co-conspirators.

6        151.    For the purpose of forming and effectuating the unlawful combination,

7  trust, agreement, understanding, and concert of action, Intel and those with whom it combined

8  and conspired have done those things which they combined and conspired to do, including but

9  in no way limited to the acts, practices and court of conduct set forth above.

10        152.    Plaintiff and the other members of the Class paid supra-competitive,

11  artificially inflated prices for x86 microprocessors as a result of this conduct and have had their

12  competitive choices of x86 microprocessors improperly limited.

13        153.    As a direct and proximate result of Intel's and its co-conspirators'

14  unlawful conduct, Plaintiff and the members of the Class have been injured in their business

15  and property in that they paid more for x86 microprocessors than they otherwise would have

16  paid in the absence of Intel's unlawful conduct. As a result of Intel's and its co-conspirators'

17  violation of Section 16720 of the California Business and Professions Code, Plaintiff seeks

18  treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section

19  16750(a) of the California Business and Professions Code.

20                  **XII.   THIRD CLAIM FOR RELIEF**

21                **(Violation of the California Unfair Competition Law)**

22        154.    Plaintiff incorporates and realleges, as though fully set forth herein, each

23  and every allegation set forth in the preceding paragraphs of this Complaint.

24        155.    Intel's unlawful conduct was centered in, carried out, effectuated and

25  perfected mainly within the State of California, and Intel's conduct within California injured all

26  members of the Class throughout the United States. Therefore, this claim for relief under

27  California law is brought on behalf of all members of the Class, whether or not they are

28  California residents.

-46-

1  156.  Intel has committed and continues to commit acts of unfair competition,

2  as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by

3  engaging in the acts and practices specified above.

4  157.  This claim is instituted pursuant to Sections 17203 and 17204 of the

5  California Business and Professions Code, to obtain restitution from Intel for acts, as alleged

6  herein, that violated Section 17200 of the California Business and Professions Code, commonly

7  known as the Unfair Competition Law.

8  158.  Intel's conduct as alleged herein violated Section 17200.  The acts,

9  omissions, misrepresentations, practices and non-disclosures of Intel, as alleged herein,

10  constituted a common continuous and continuing course of conduct of unfair competition by

11  means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of

12  California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to,

13  the following:

14  a.  The violations of Section 2 of the Sherman Act (15 U.S.C. §2), as

15  set forth above;

16  b.  Violations of Section 3 of the Clayton Act (15 U.S.C. §14);

17  c.  The violations of Sections 16720 *et seq.*, 17045, 17046, 17047, and

18  17048 of the California Business and Professions Code;

19  d.  Intel's acts, omissions, misrepresentations, practices and non-

20  disclosures, as described above, whether or not in violation of

21  Sections 16720, *et seq.*, 17045, 17046, 17047, and 17048 of the

22  California Business and Professions Code, and whether or not

23  concerted or independent acts, are otherwise unfair,

24  unconscionable, unlawful or fraudulent;

25  e.  Intel's act and practices are unfair to consumers of x86

26  microprocessors in the State of California and throughout the

27  United States, within the meaning of Section 17200 of the

28  California Business and Professions Code; and

-47-

COMPLAINT

1          f.      Intel's acts and practices are fraudulent or deceptive within the

2                  meaning of Section 17200 of the California Business and

3                  Professions Code.

4          159.    Plaintiff and each of the Class members are entitled to full restitution

5    and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may

6    have been obtained by Intel as a result of such business acts or practices.

7          160.    The illegal conduct alleged herein is continuing and there is no indication

8    that Intel will not continue such activity into the future.

9          161.    The unlawful and unfair business practices of Intel, as described above,

10   have caused and continue to cause Plaintiff and the members of the Class to pay supra-

11   competitive and artificially-inflated prices for x86 microprocessors. Plaintiff and the members

12   of the Class suffered injury in fact and lost money or property as a result of such unfair

13   competition.

14         162.    The conduct of Intel as alleged in this Complaint violates Section 17200

15   of the California Business and Professions Code.

16         163.    As alleged in this Complaint, Intel has been unjustly enriched as a result

17   of its wrongful conduct and by Intel's unfair competition. Plaintiff and the members of the

18   Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all

19   revenues, earnings, profits, compensation and benefits which may have been obtained by Intel

20   as a result of such business practices, pursuant to the California Business and Professions

21   Code, Sections 17203 and 17204.

22                      **XIII.  FOURTH CLAIM FOR RELIEF**

23                 **(Violations of California's Tort Law Against Monopoly)**

24         164.    Plaintiff incorporates and realleges, as though fully set forth herein, each

25   and every allegation set forth in the preceding paragraphs of this Complaint.

26         165.    By virtue of the conduct described above, Intel has engaged in tortious

27   and unlawful monopolization of the x86 microprocessor market.

28

-48-

COMPLAINT

1    166.    Such conduct gives rise to a cause of action for common law monopoly

2  under California law.

3    167.    As a direct and proximate result of Intel's acts of monopolization alleged

4  herein, plaintiff and the members of the Class have suffered actual damages in an amount to be

5  proven at trial.

6    168.    Intel's acts of monopolization described herein were intended to

7  monopolize and suppress competition in the relevant market and to injure consumers. Intel's

8  acts included acts of fraud, malice and oppression and were undertaken with conscious

9  disregard of the rights of consumers, including plaintiff and members of the Class.

10  Accordingly, an award of punitive damages is justified in order to make an example of Intel, to

11  punish it and to deter it and others from engaging in the same or similar conduct. Plaintiff and

12  members of the Class seek an award of punitive damages in an amount according to proof at

13  trial.

14    ### XIV.   FIFTH CLAIM FOR RELIEF

15    **(Violations of State Antitrust and Unfair Competition Laws)**

16    169.    Plaintiff incorporates and realleges, as though fully set forth herein, each

17  and every allegation set forth in the preceding paragraphs of this Complaint.

18    170.    By reason of the foregoing, Intel has restrained trade in violation of

19  Alabama Code §§8-10-1 *et seq.*

20    171.    By reason of the foregoing, Intel has restrained trade in violation of

21  Arizona Revised Stat. §§44-1401 *et seq.*

22    172.    By reason of the foregoing, Intel has restrained trade in violation of

23  California Bus. & Prof. Code §§16700 *et seq.* and Cal. Bus. & Prof. Code §§17200 *et seq.*

24    173.    By reason of the foregoing, Intel has restrained trade in violation of

25  District of Columbia Code Ann. Code §§28-4503 *et seq.*

26    174.    By reason of the foregoing, Intel has restrained trade in violation of Iowa

27  Code §§553.1 *et seq.*

28

-49-

COMPLAINT

1           175.   By reason of the foregoing, Intel has restrained trade in violation of

2 Kansas Stat. Ann §§50-101 *et seq.*

3           176.   By reason of the foregoing, Intel has restrained trade in violation of

4 Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

5           177.   By reason of the foregoing, Intel has restrained trade in violation of

6 Michigan Comp. Laws. Ann. §§445.773 *et seq.*

7           178.   By reason of the foregoing, Intel has restrained trade in violation of

8 Minnesota Stat. §§325D.52 *et seq.*

9           179.   By reason of the foregoing, Intel has restrained trade in violation of

10 Mississippi Code Ann. §§75-21-1 *et seq.*

11           180.   By reason of the foregoing, Intel has restrained trade in violation of

12 Nebraska Rev. Stat. §§59-801 *et seq.*

13           181.   By reason of the foregoing, Intel has restrained trade in violation of

14 Nevada Rev. Stat. Ann. §§598A *et seq.*

15           182.   By reason of the foregoing, Intel has restrained trade in violation of New

16 Mexico Stat. Ann. §§57-1-1 *et seq.*

17           183.   By reason of the foregoing, Intel has restrained trade in violation of

18 North Carolina Gen. Stat. §§75-1 *et seq.*

19           184.   By reason of the foregoing, Intel has restrained trade in violation of

20 North Dakota Cent. Code §§51-08.1-01 *et seq.*

21           185.   By reason of the foregoing, Intel has restrained trade in violation of Ohio

22 Rev. Code Ann. §§1331.01 *et seq.*

23           186.   By reason of the foregoing, Intel has restrained trade in violation of

24 Pennsylvania common law.

25           187.   By reason of the foregoing, Intel has restrained trade in violation of

26 South Dakota Codified Laws Ann. §§37-1 *et seq.*

27           188.   By reason of the foregoing, Intel has restrained trade in violation of

28 Tennessee Code Ann. §§47-25-101 *et seq.*

-50-

COMPLAINT

1         189.    By reason of the foregoing, Intel has restrained trade in violation of

2  Vermont Stat. Ann. 9 §§2453 *et seq.*

3         190.    By reason of the foregoing, Intel has restrained trade in violation of West

4  Virginia §§47-18-1 *et seq.*

5         191.    By reason of the foregoing, Intel has restrained trade in violation of

6  Wisconsin Stat. §§133.01 *et seq.*

7         192.    Class Members in each of the states listed above paid supra-competitive,

8  artificially inflated prices for x86 microprocessors. As a direct and proximate result of Intel's

9  unlawful conduct, such members of the Class have been injured in their business and property

10  in that they paid more for x86 microprocessors than they otherwise would have paid in the

11  absence of Intel's unlawful conduct.

12                **XV.**   **SIXTH CLAIM FOR RELIEF**

13      **(Violation of State Consumer Protection and Unfair Competition Laws)**

14         193.    Plaintiff incorporates and realleges, as though fully set forth herein, each

15  and every allegation set forth in the preceding paragraphs of this Complaint.

16         194.    Intel engaged in unfair competition or unfair, unconscionable, deceptive

17  or fraudulent acts or practices in violation of the state consumer protection and unfair

18  competition statutes listed below.

19         195.    Intel has engaged in unfair competition or unfair or deceptive acts or

20  practices in violation in violation of Alaska Code §§45.50.471 *et seq.*

21         196.    Intel has engaged in unfair competition or unfair or deceptive acts or

22  practices in violation of Arkansas Revised Stat. §§4-88-101 *et seq.*

23         197.    Intel has engaged in unfair competition or unfair or deceptive acts or

24  practices in violation of California Bus. & Prof. Code §§17200 *et seq.*

25         198.    Intel has engaged in unfair competition or unfair or deceptive acts or

26  practices in violation of District of Columbia Code §§28-3901 *et seq.*

27         199.    Intel has engaged in unfair competition or unfair or deceptive acts or

28  practices in violation of Florida Stat. §501.201 *et seq.*

COMPLAINT

1          200.    Intel has engaged in unfair competition or unfair or deceptive acts or
2   practices in violation of Hawaii Rev. Stat. §480 *et seq.*

3          201.    Intel has engaged in unfair competition or unfair or deceptive acts or
4   practices in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

5          202.    Intel has engaged in unfair competition or unfair or deceptive acts or
6   practices in violation of Idaho Code §48-601 *et seq.*

7          203.    Intel has engaged in unfair competition or unfair or deceptive acts or
8   practices in violation of Kansas Stat. §50-623 *et seq.*

9          204.    Intel has engaged in unfair competition or unfair or deceptive acts or
10  practices in violation of Louisiana Rev. Stat. §51:1401 *et seq.*

11         205.    Intel has engaged in unfair competition or unfair or deceptive acts or
12  practices in violation of 5 Maine Rev. Stat §207 *et seq.*

13         206.    Intel has engaged in unfair competition or unfair or deceptive acts or
14  practices in violation of Montana Code §30-14-101 *et seq.*

15         207.    Intel has engaged in unfair competition or unfair or deceptive acts or
16  practices in violation of Nebraska Rev. Stat. §59-1601 *et seq.*

17         208.    Intel has engaged in unfair competition or unfair or deceptive acts or
18  practices in violation of New Mexico Stat. §57-12-1 *et seq.*

19         209.    Intel has engaged in unfair competition or unfair or deceptive acts or
20  practices in violation of New York Gen. Bus. Law §349 *et seq.*

21         210.    Intel has engaged in unfair competition or unfair or deceptive acts or
22  practices in violation of North Carolina Gen. Stat. §75-1.1 *et seq.*

23         211.    Intel has engaged in unfair competition or unfair or deceptive acts or
24  practices in violation of Oregon Rev. Stat. §646.605 *et seq.*

25         212.    Intel has engaged in unfair competition or unfair or deceptive acts or
26  practices in violation of Rhode Island Gen. Laws. §6-13.1-1 *et seq.*

27         213.    Intel has engaged in unfair competition or unfair or deceptive acts or
28  practices in violation of South Carolina Code Laws §39-5-10 *et seq.*

-52-

COMPLAINT

1       214.    Intel has engaged in unfair competition or unfair or deceptive acts or
2   practices in violation of Utah Code §13-1-1 *et seq.*

3       215.    Intel has engaged in unfair competition or unfair or deceptive acts or
4   practices in violation of 9 Vermont §2451 *et seq.*

5       216.    Intel has engaged in unfair competition or unfair or deceptive acts or
6   practices in violation of West Virginia Code §46A-6-101 *et seq.*

7       217.    Intel has engaged in unfair competition or unfair or deceptive acts or
8   practices in violation of Wyoming Stat. §40-12-105.

9       218.    Class Members in the states listed above paid supra-competitive,
10  artificially inflated prices for x86 microprocessors. As a direct and proximate result of Intel's
11  unlawful conduct, Plaintiff and the members of the Class have been injured in their business
12  and property in that they paid more for x86 microprocessors than they otherwise would have
13  paid in the absence of Intel's unlawful conduct.

14                      **XVI.   SEVENTH CLAIM FOR RELIEF**

15                      **(Unjust Enrichment and Disgorgement of Profits)**

16      219.    Plaintiff incorporates and realleges, as though fully set forth herein, each
17  and every allegation set forth in the preceding paragraphs of this Complaint.

18      220.    Intel has been unjustly enriched through overpayments by Plaintiff and
19  Class members and the resulting profits.

20      221.    Under common law principles of unjust enrichment, Intel should not be
21  permitted to retain the benefits conferred via overpayments by Plaintiff and Class members.

22      222.    Plaintiff seeks disgorgement of all profits resulting from such
23  overpayments and establishment of a constructive trust from which Plaintiff and Class members
24  may seek restitution.

25                      **PRAYER FOR RELIEF**

26              WHEREFORE, Plaintiff prays:

27      A.      That the Court determine that the Sherman Act, state antitrust law, and
28  state consumer protection and/or unfair competition law claims alleged herein may be

-53-

COMPLAINT

1  maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil

2  Procedure;

3            B.     That the conduct alleged herein be adjudged and decreed to be:

4                     1.     Unlawful monopolization and an unlawful conspiracy to monopolize

5                          in violation of Section 2 of the Sherman Act, and/or California

6                          common law, as alleged in the First and Fourth Claims for Relief;

7                     2.     Violation of the state antitrust laws identified in the Second and

8                          Fifth Claims for Relief herein;

9                     3.     Violations of the state consumer protection and unfair competition

10                         laws identified in the Third and Sixth Claims for Relief herein;

11                    4.     Acts of unjust enrichment as set forth in the Seventh Claim for

12                         Relief herein.

13           C.     That Plaintiff and the members of Class recover damages, as provided by

14 federal and state antitrust laws, and that a joint and several judgment in favor of Plaintiff and

15 the Class be entered against Intel in an amount to be trebled in accordance with such laws;

16           D.     That Intel, its affiliates, successors, transferees, assignees, and the

17 officers, directors, partners, agents, and employees thereof, and all other persons acting or

18 claiming to act on their behalf, be permanently enjoined and restrained from in any manner

19 engaging in the unlawful conduct described herein.

20           E.     That Plaintiff and members of the Class be awarded restitution, including

21 disgorgement of profits obtained by Intel as a result of their acts of unfair competition and acts

22 of unjust enrichment;

23           F.     That Plaintiff and members of the Class be awarded punitive damages

24 with respect to their Fourth Cause of Action;

25           G.     That Plaintiff and members of the Class be awarded pre- and post-

26 judgment interest, and that that interest be awarded at the highest legal rate from and after the

27 date of service of the initial complaint in this action;

28

-54-

COMPLAINT

1             H.      That Plaintiff and members of the Class recover their costs of this suit,

2 including reasonable attorneys' fees as provided by law; and

3             I.      That Plaintiff and members of the Class have such other, further, and

4 different relief as the case may require and the Court may deem just and proper under the

5 circumstances.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-55-

COMPLAINT

1

2                                    **DEMAND FOR TRIAL BY JURY**

3                223.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff

4    demands a trial by jury for all issues so triable.

5

6    Dated: July 11, 2005                                Respectfully submitted,

7                                                        SPENCER HOSIE (#101777)
                                                         BRUCE J. WECKER (#078530)
8                                                        HOSIE McARTHUR LLP
                                                         One Market Street,
9                                                        Spear Street Tower #2200
                                                         San Francisco, California 94105
10                                                       Telephone: (415) 247-6000
                                                         Facsimile:  (415) 247-6001
11

12                                              By:   _____
                                                     Attorneys for Plaintiff Dwight E. Dickerson
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                    -56-
     COMPLAINT